UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SCOTT E. YOUMAN, Sr., Individually and as Administrator of the Estates of PAULA J. YOUMAN and WILLIAM P. YOUMAN, Plaintiff | ) | |
| v. | ) | C.A. NO. 05-535T |
| UNITED STATES OF AMERICA, Defendant | ) | |

**PLAINTIFF'S PRETRIAL MEMORANDUM**

A. PARTIES and TRIAL COUNSEL

The plaintiff, Scott E. Youman, Sr., Individually and
as Administrator of the Estates of Paula J. Youman and
William P. Youman

Trial Counsel:

Ann Marie Maguire, Esq.
Charlotte E. Glinka, Esq.
Keches & Mallen, P.C.
122 Dean Street
Taunton, MA 02780

B. FACTS

This is a medical negligence action involving the tragic death of Paula Youman, age 29, and her son, William Youman, who died in March, 2003. Mrs. Youman left surviving her husband, Scott Youman, and two minor children, Scott, Jr. and Richard. The circumstances of the case involve the prenatal medical care provided to Paula Youman by physicians Lisa Jones, M.D. and Laurie Curry, M.D. at the Thundermist Health Center, a federally-funded facility. In particular, the case involves claims that the defendants failed to properly diagnose and treat Ms. Youman's gestational diabetes. This case has been brought pursuant to the Federal Tort Claims Act. Although there are a number of pertinent facts, as set forth below, this is not a medically complicated case.

Furthermore, the expert opinions in the case are, for the most part, consistent with respect to the key medical issues.

Paula Youman became pregnant with her son, William, in the spring of 2002. She was considered a high-risk patient but no high-risk consult was ever obtained during the pertinent time period of this case. In particular, despite a past referral relationship for high-risk patients between the Thundermist physicians and Dr. Marshall Carpenter, a maternal-fetal medicine specialist and the defendant's expert in this case, no referral of Paula Youman was ever made. Accordingly, the Thundermist physicians assumed the responsibility for this high-risk pregnancy.

Mrs. Youman's estimated date of delivery (EDD) was 5/7/03. On 1/16/03 (at 24 weeks gestation), a standard one hour post prandial (screening) glucose test was performed which showed a glucose level of 121, which is in the normal range. In early March, 2003, Mrs. Youman was advised to go on bedrest and was to be seen for prenatal visits and non-stress tests (NST's) twice a week. On 3/10/03, Mrs. Youman presented for her prenatal appointment at 31.5 weeks gestation and was seen by Dr. Jones. She was noted to be having irregular contractions and was sent to the labor and delivery area at Landmark Medical Center to be evaluated for pre-term labor. Dr. Jones was listed as the admitting physician.

Labs were drawn on admission at Landmark, including a blood glucose level (before the administration of any medications) which was noted to be 168, well outside the normal range of 70-110. Mrs. Youman was given Terbutaline and IV fluids and was found to have only rare contractions with an active fetus. An ultrasound performed on 3/11/03 noted the baby to be at 32 weeks gestation, was sized for 33.4 weeks and in the 85% for weight. Mrs. Youman was seen during this hospital admission by Dr. Curry, one of her Thundermist physicians. A second blood sugar was

drawn on 3/12/03, the morning of Mrs. Youman's discharge, and the result was even more abnormal, at 226. It is presumed that because this lab test was done at about 6:30 in the morning that the blood was drawn while Mrs. Youman was in a fasting state (i.e., not having eaten in the overnight period). The nurse's notes from 3/12/03 also indicate that Mrs. Youman was complaining of increased thirst, had an oral intake of 2100 cc's of fluids, and was voiding frequently. Increased thirst and frequent voiding in a pregnant patient with elevated blood sugar are worrisome signs and symptoms of gestational diabetes. Michele Bauer, NM, one of the nurse-midwives in the Thundermist practice, saw Mrs. Youman at the hospital on the morning of March 12 at Dr. Curry's request for purposes of arranging her discharge from the hospital. Ms. Bauer did not note the abnormal blood sugar levels at that time but did advise Mrs. Youman to be seen in the office the next day. The American Diabetes Association states that a serum glucose of greater than 200 meets the threshold for the diagnosis of gestational diabetes.

Dr. Lisa Jones involvement in the care of this patient occurred during the critical time period of Paula Youman's hospitalization at Landmark from March 10-March 12, 2003, and the day after her discharge, when the patient was seen at Thundermist on March 13, 2003. A non-stress test done on that day was noted to be reactive. That same day, a copy of the lab report from Landmark showing the elevated blood sugar levels was received by Thundermist and reviewed and signed by Dr. Curry. Accordingly, both Dr. Jones and Dr. Curry were aware or should have been aware as of 3/13/03 of the abnormal blood sugar levels, and should have undertaken appropriate measures to address these worrisome findings. This would have included a documented plan for the patient to be placed on a diet and to be given a glucose monitor to check her blood sugars throughout the day to note any elevations. Any persistent elevation in the patient's blood sugars would have required

the institution of insulin. Despite the documented elevation in Mrs. Youman's blood sugars, however, no further evaluation was performed and no treatment was provided.

Mrs. Youman was seen in the office by Dr. Curry on 3/18/03 for her next prenatal appointment. At that time, Mrs. Youman had an elevated blood pressure of 132/86, with a 4+ sugar in her urine (glycosuria). A 4+ glycosuria is the highest value that can be recorded and is considered to be a sign of gestational diabetes. There is nothing in the medical record to indicate that Mrs. Youman had ingested a high concentration of a sugar drink or other sugar substance that would account for this elevation. A non-stress test (NST) performed that day was non-reactive and Mrs. Youman was told to go to the hospital to have another NST performed. The test at Landmark was reported as reactive (indicating the viability of the fetus at that time) and Mrs. Youman was sent home. As of the March 18, 2003 office visit, Dr. Curry had available to her not only the immediate urine glucose reading, but also had the hospital labs showing the elevations in her blood sugar on March 10 and March 12. She also knew that, at least based on the NST done in the office, that there was at least a question as to the reactivity of the fetus. This information, in combination, represented a medical emergency and required urgent and immediate treatment. Instead of addressing this issue in an urgent manner, Dr. Curry sent Mrs. Youman home and provided her with a referral for a fasting glucose test. The form does not state when Mrs. Youman is to return for the test and does not state any urgency associated with having that test performed. Despite her expected testimony that she was sending the patient for the blood glucose the next day, there is nothing in the record to indicate that Dr. Curry followed up with the patient or with anyone else to ensure that the test was carried out on March 19, 2003.

There is no indication in the record of a plan to manage this patient for purposes of making

an accurate diagnosis. There is no indication that Dr. Curry had any discussion with Mrs. Youman about the possible implications of the glucose in her urine or that the blood glucose test she was ordering may indicate a potentially serious complication of her pregnancy that put her own health and that of her unborn child in jeopardy. Mrs. Youman's next scheduled prenatal appointment was 3/20/03, and she told her husband that she was going to be going in that day for some tests. The only documentation of a purported "plan" by Dr. Curry to follow up on the patient's elevated glucose of greater than 200 and her glycosuria, is an addendum note written on 3/26/03, after the patient died.

On 3/20/03, Mrs. Youman was taken by ambulance to the Landmark Medical Center with complaints of difficulty breathing. Her blood sugar was found to be an alarmingly high 1202. She had an increased BUN of 32, creatinine of 2.3 and bicarbonate of 7. Mrs. Youman's baby was noted to have died in utero. Mrs. Youman was admitted to the ICU with aggressive IV hydration and an insulin drip to treat her elevated blood sugars, which did initially come down.

Mrs. Youman had a spontaneous rupture of membranes on 3/21/03 at around 2:00 a.m. with delivery of her stillborn son at 5:45 a.m. Following the delivery, her blood pressure and urine output decreased. She was placed on Levophed and given large amounts of IV fluid. She had an elevated temperature to 104° and an infectious disease consult was called. She was determined to be in renal failure with severe metabolic acidosis. Mrs. Youman continued to deteriorate and ultimately suffered a cardiac arrest in the early afternoon of 3/21/03. After attempts at resuscitation failed, she was pronounced dead at 2:30 p.m. The cause of death was presumed to be from shock syndrome secondary to fetal demise, maternal sepsis, severe hyperglycemia and metabolic acidosis.

An autopsy was performed and Mrs. Youman's death was attributed to multisystem organ

failure associated with severe hyperglycemia, acute necrotizing pancreatitis, fatty liver, sepsis and intrauterine fetal demise. *See* Death Certificate and Autopsy of Paula Youman at Exhibit 6. The fetal autopsy noted that there were significant findings on the placenta associated with the mother's hyperglycemia which likely caused the baby's death.

C. CLAIMS AND DEFENSES

**I. NEGLIGENCE**

The defendant United States of America, by and through its agents, servants and/or employees, including agents, servants and/or employees of The Thundermist Health Center, and including Laurie Curry, M.D. and Lisa Jones, M.D., rendered medical treatment to the decedents, Paula J. Youman and William Youman, and therefore owed to the decedents a duty of due care in accordance with accepted standards of medical care and treatment. The defendant breached its duty when its agents, servants and/or employees negligently and carelessly treated the decedents in a manner which resulted in the decedents' conscious pain and suffering and wrongful death. The decedents' injuries and wrongful death were the direct and proximate result of the defendant's carelessness, unskillfulness, negligence and improper care and treatment.

The plaintiff contends that Mrs. Youman's medical care providers, including her care providers at Thundermist Health Center, deviated from the accepted standards of care in their treatment of her during her pregnancy, thereby resulting in the death of her infant son in utero on March 20, 2003, as well as her own pain and suffering and wrongful death on March 21, 2003.

In particular, the plaintiff contends that the physicians at the Thundermist Health Center failed to properly diagnose and treat Paula Youman for gestational diabetes during the pre-natal period, including during her hospitalization at the Landmark Medical Center between the dates of

March 10, 2003 and March 12, 2003, and after that date when she was seen at the Thundermist office and prior to her hospitalization at Landmark Medical Center on March 20, 2003. During this time period, Mrs. Youman had worrisome signs and symptoms of gestational diabetes. The doctors failed to properly appreciate the significance of these findings and failed to take appropriate steps to diagnose and treat her condition.

The plaintiff contends that Dr. Laurie Curry deviated from the accepted standard of care when she failed to properly care for and treat Mrs. Youman during her hospital admission of March 10-March 12, 2003. Dr. Curry evaluated the patient in the hospital, should have been aware of the two abnormal blood sugar levels, and should have taken appropriate measures to address these worrisome findings. Furthermore, when the lab results for the March 12, 2003 blood glucose level were sent to Thundermist, Dr. Curry reviewed and signed off on them. Accordingly, she was aware as of the day after the patient's hospital discharge of the abnormal test results and should have instituted an appropriate care plan for the patient's gestational diabetes at that time.

Dr. Laurie Curry also deviated from the accepted standard of care when she failed to properly care for and treat Mrs. Youman at her prenatal visit of March 18, 2003. Mrs. Youman was noted to have elevated blood pressure, 4+ sugar in her urine, edema and a non reactive stress test on this date. In addition, in Dr. Curry's post-death note regarding Mrs. Youman, she acknowledges that she was aware Mrs. Youman had a serum glucose level greater than 200. Mrs. Youman should have been admitted to the hospital on this date for careful evaluation, monitoring and treatment of her gestational diabetes. A stat serum blood sugar should have been performed to immediately assess her status. It was a deviation for Dr. Curry to send Mrs. Youman home, and to delay any blood sugar testing until the following day. As a result of the failure of Dr. Curry to provide Mrs.

Youman with the proper care and treatment, Mrs. Youman's infant son died in utero, Mrs. Youman's untreated elevated blood sugar skyrocketed to 1200 and she went on to develop severe hyperglycemia, multisystem organ failure, severe lactic acidosis and sepsis. We contend that if Dr. Curry had provided Mrs. Youman with the proper care and treatment on March 18, 2003, Mrs. Youman would not have died a premature death on March 21, 2003 and her infant son would not have died in utero sometime between March 18, 2003 and March 20, 2003.

The plaintiff contends that Dr. Lisa Jones deviated from the accepted standard of care when she failed to properly care for and treat Mrs. Youman with respect to her hospital admission of March 10-March 12, 2003. Dr. Jones, as the physician who sent the patient to the hospital, should have investigated the patient's condition during that admission, should have been aware of the two abnormal blood sugar levels, and should have taken appropriate measures to address these worrisome findings. Paula Youman was instructed by the Thundermist care providers to be seen at the Thundermist office the day after her discharge from the hospital and was seen at Thundermist on March 13, 2003. Dr. Jones failed to appropriately evaluate the patient in light of her recent hospitalization, failed to obtain the lab test results, and failed to take the appropriate steps to follow-up on the patient's condition at that time.

The plaintiff contends that if Dr. Jones had provided Mrs. Youman with the proper care and treatment as of the period between March 10 and March 13, 2003, Mrs. Youman would not have died a premature death on March 21, 2003 and her infant son would not have died in utero sometime between March 18, 2003 and March 20, 2003.

**2. FAILURE TO OBTAIN INFORMED CONSENT**

At all relevant times, average qualified members of the medical profession practicing the

defendant's specialties, including the defendant physicians, knew or should have known of the risks, potential consequences and alternatives to the defendant's choice of treatment of the decedents, Paula J. Youman and William Youman. The defendant physicians did not inform the decedent of the alternatives to, risks and potential consequences of the their choice of treatment of the decedents.

The plaintiff claims that if the defendant physicians had informed Paula Youman of the alternatives to, risks and potential consequences of their choice of treatment, neither the decedent nor a reasonable person in her position would have elected the defendant's choice of treatment. The alternatives to, risks and potential consequences of the defendant's choice of treatment were material to a decision by the decedent, and a reasonable person in her position, as to whether to elect the defendant's choice of treatment. The decedents' injuries and wrongful death were the direct and proximate result of the defendant's failure to obtain and/or provide informed consent.

D. DAMAGES

**I. LOSS OF EARNING CAPACITY**

Lost Earning Capacity of William Youman: Calculations include Earning Capacity, and Fringe Benefits less Income Taxes and Living Expenses for a total Present Value of **$1,506,296.**

Lost Earning Capacity of Paula J. Youman: Calculations include Earning Capacity, and Fringe Benefits less Income Taxes and Living Expenses for a total Present Value of: $**371,816.**

**II. LOSS OF HOUSEHOLD SERVICES**

Lost Household Services of Paula J. Youman at Present Value: **$854,904**.

In summary:

**PAULA YOUMAN**

| | |
|---|---|
| Lost Earnings | $371,816.00 |
| Lost Homemaking Svcs | $854,904.00 |
| Total | $1,226,720.00 |

**WILLIAM YOUMAN**

| | |
|---|---|
| Lost Earnings | $1,506,296.00 |
| **TOTAL** | **$2,733,016.00** |

## III. CONSCIOUS PAIN & SUFFERING

Paula Youman was severely ill when she was admitted to the hospital on March 20, 2003, but she was aware of the gravity of her own condition and was also aware that she had lost her child.

## IV. WRONGFUL DEATH/LOSS OF CONSORTIUM

At the time of Paula Youman's death she was 29 years old and had a probable further life expectancy to age 84. She was married to Scott Youman, now age 35. They were married in 1996 and had two sons, Scott, Jr. (DOB: 6/3/94) and Richard (DOB: 1/4/00), who were ages 8 and 3 at the time of their mother's death, and are now ages 13 and 8. The funeral and burial expenses for Paula Youman and William Youman total $5,990.00.

<u>PLAINTIFF'S CLAIM FOR DAMAGES</u>

| | |
|---|---|
| Pain and Suffering and Wrongful Death of Paula Youman: | $3,500,000 |
| Wrongful Death of William Youman: | $2,000,000 |
| Ante Mortem Loss of Consortium Claim of Scott Youman: | $ 500,000 |
| **TOTAL:** | **$6,000,000** |

E. ISSUES

______1. Whether Dr. Curry was negligent in her care and treatment of the decedent, Paula Youman.

2. Whether Dr. Curry's negligence was a substantial factor contributing to the death of the plaintiff's minor decedent, William Youman.

3. Whether Dr. Curry's negligence was a substantial factor contributing to the injuries and death of the plaintiff's decedent, Paula Youman.

______4. Whether Dr. Jones was negligent in her care and treatment of the decedent, Paula Youman.

5. Whether Dr. Jones' negligence was a substantial factor contributing to the death of the plaintiff's minor decedent, William Youman.

6. Whether Dr. Jones' negligence was a substantial factor contributing to the injuries and death of the plaintiff's decedent, Paula Youman.

7. Whether Dr. Curry was negligent in failing to obtain and/or provide informed consent to Paula Youman.

8. Whether Dr. Curry's negligence was a substantial factor contributing to the death of the plaintiff's minor decedent, William Youman.

9. Whether Dr. Curry's negligence was a substantial factor contributing to the injuries and death of the plaintiff's decedent, Paula Youman.

10. Whether Dr. Jones was negligent in failing to obtain and/or provide informed consent to Paula Youman.

11. Whether Dr. Jones' negligence was a substantial factor contributing to the death of

the plaintiff's minor decedent, William Youman.

12. Whether Dr. Jones' negligence was a substantial factor contributing to the injuries and death of the plaintiff's decedent, Paula Youman.

F. ARGUMENTS

The defendant, through its agents, owed a duty of care to the decedents, Paula Youman and William Youman. The defendant breached that duty of care by deviating from the accepted standard of care, which caused the deaths of Paula Youman and William Youman.

The Thundermist Health Center is a federally funded institution, therefore, The United States of America is liable for the malpractice of its agents and or/employees. As such, the United States of America is liable for any medical malpractice of the physicians working at Thundermist.

In this medical malpractice action, as in any other negligence action, the plaintiff must establish a standard of care as well as a deviation from that standard. Boccasile v. Cajun Music Ltd., 694 A.2d 686, 689 (R.I. 1997) (quoting Sousa v. Chaset, 519 A.2d 1132, 1135 (R.I. 1987)). The physicians in this case were under a "duty to use the degree of care and skill that is expected of a reasonably competent practitioner in the same class to which he or she belongs, acting in the same or similar circumstances." Sheeley v. Memorial Hospital, 710 A.2d 161, 167 (R.I. 1998). (See, Parrella v. Bowling, 796 A.2d 1097 (R.I. 2002). Here, the plaintiff has the burden to establish that the defendant physicians had a duty to act or refrain from acting and that there was a causal connection between their breach of that duty and the injury. Schenck v. Roger Williams General Hospital, 119 R.I. 510, 514 (1977). A physician is bound to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice . . . ." Sousa v. Chaset, 519 A.2d 1132, 1135 (R.I. 1987) (quoting Young v. Park, 417 A.2d 889, 893 (R.I. 1980). This

standard of care is based upon a national, rather than a local, standard. Sheeley v. Memorial Hospital, 710 A.2d 161, 167 (R.I. 1998).

The plaintiff's expert, Harlan Giles, M.D., is Board Certified in Obstetrics and Gynecology and Maternal-Fetal Medicine. Dr. Giles is expected to testify that, to a reasonable degree of medical certainty, there were several deviations in the care provided to Mrs. Youman which substantially contributed to her death. More specifically, Dr. Giles is expected to testify that Lisa Jones, M.D. should have collaborated in the care of Mrs. Youman in the hospital during her March 10-12, 2003 admission and she should have recognized the potential significance of the elevated blood sugars noted during that admission. Dr. Jones should have taken the proper steps to further assess Mrs. Youman for gestational diabetes at that time.

Dr. Giles is expected to testify that the blood sugar of 168 on March 10, 2003, appears to have been drawn prior to the time Mrs. Youman received her initial doses of Terbutaline and Dexamethasone, and therefore those medications would have had no effect on the elevated blood sugar level. Dr. Jones was aware that her patient had been admitted to the hospital and she should have ensured that Mrs. Youman received the care that she needed during that admission. This was a deviation from the standard of care. Given the blood sugar levels of 168 and 226, Mrs. Youman should have been deemed to be high risk. The significantly elevated blood sugars likely represented gestational diabetes which, if left untreated, posed a serious health risk to both the fetus and to Mrs. Youman. The risk of sudden fetal death rises substantially when there is a significant rise in the maternal blood sugar. In addition, untreated maternal hyperglycemia can lead to diabetic ketoacidosis with resulting acidosis, multi-organ system failure and death.

Dr. Giles is expected to testify that Laurie Curry, M.D., the doctor from Thundermist

following Mrs. Youman during the March 10, 2003 admission to Landmark, had a duty to collaborate with the nurse midwife who discharged Mrs. Youman on March 12, 2003, and she should have reviewed the hospital chart of Mrs. Youman for the admission of March 10-12, 2003. Mrs. Youman was a high risk patient and required care from a fully trained obstetrician at this point. This was a deviation from the standard of care.

Dr. Giles is expected to testify that according to the deposition transcript of Dr. Jones, Dr. Curry would have reviewed the test results that identified that Mrs. Youman had a significantly elevated blood sugar of 226 on the morning of 3/12/03. In addition, the hospital chart notes that Mrs. Youman was reporting increased thirst and increased urination. The nurses notes from 2:00 a.m. on 3/12/03 document that Mrs. Youman took in 2280 cc's of oral fluid during the shift up until the time this note was written. The actual intake and output sheet shows additional oral intake of fluid beyond 2:00 and up until 6:00 a.m. With the additional fluid, Mrs. Youman would have ingested approximately 3560 cc's of oral fluid during the 11-7 shift. The amount of oral fluid taken in by this patient at that time was worrisome for gestational diabetes. Failure to act upon these worrisome findings was a deviation from the standard of care.

Dr. Giles is expected to testify that this constellation of findings was very worrisome for gestational diabetes and Dr. Curry should have immediately contacted Mrs. Youman to have her evaluated for this condition. Mrs. Youman required immediate treatment for her elevated blood sugar, which would have included admission to the hospital, diet modification and treatment with insulin; failure to do so was a deviation from the standard of care.

Dr. Curry also should have consulted with an endocrinologist for assistance in managing this patient. If Dr. Curry was of the impression that the fasting blood sugar of 226 from March 12, 2003,

was solely as a result of the patient's having been provided with lactated ringers IV solution, Terbutaline and Dexamethasone, she should have investigated this further before reaching this dangerous conclusion which resulted in no treatment being provided to the patient for her gestational diabetes. Dr. Curry's failure to adequately investigate was a deviation from the standard of care.

Dr. Giles is expected to testify that Mrs. Youman was given only one dose of Terbutaline of 0.25 mg sc on 3/10/03 at 19:40. This one dose of Terbutaline from 3/10/03 would have had little or no impact on the blood sugar drawn on 3/12/03. Based upon the intake and output sheet, Mrs. Youman's lactated ringers IV solution appears to have been discontinued some time around 10:00 a.m. on 3/11/03. According to the physician's order sheet, this change was made in a telephone order by Dr. Curry herself, with Mrs. Youman's IV site being converted to a heparin lock. This means no more IV fluid containing sugar would have been administered to Mrs. Youman after approximately 10:00 a.m. on 3/11/03 and by 3/12/03 at 6:30 a.m., when the fasting blood sugar was drawn, and would have had no impact on the elevation found.

Dr. Giles is expected to testify that although Dexamethasone may cause a transient elevation in the maternal blood sugar, this effect is negated within 24-48 hours and certainly by 72 hours. When Dr. Curry became aware of the elevated blood sugar on 3/13/03, even if she felt the elevation was solely due to the administration of Dexamethasone, she should have ordered a repeat blood sugar to ensure that the elevation was not due to gestational diabetes; her failure to do so was a deviation from the standard of care. Untreated gestational diabetes with a significantly elevated blood sugar posed a serious risk to both the fetus and to Mrs. Youman. The risk of sudden fetal death rises substantially when there is a significant rise in the maternal blood sugar. In addition,

untreated maternal hyperglycemia can lead to diabetic ketoacidosis with resulting acidosis, multi-organ system failure and death.

Dr. Giles is expected to testify that there were additional deviations in the standard of care by Dr. Curry on March 18, 2003. When Mrs. Youman presented to the prenatal clinic with 4+ sugar in her urine, along with a non-reactive stress test and a known history of an elevated blood sugar over 200, Mrs. Youman required immediate hospitalization and treatment for her diabetes. Treatment should have included diet modification and insulin to treat her elevated blood sugar, and supportive therapy. In addition, a biophysical profile should have been ordered at that time to provide a more complete assessment of fetal well-being. The failure to provide this proper treatment was a deviation from the standard of care.

In addition, Dr. Curry's stated plan to have Mrs. Youman return on March 19, 2003 for a fasting glucose challenge test, which would have included ingesting 50 grams of sugar, was a deviation from the accepted standard of care and would likely have resulted in the development of diabetic ketoacidosis or even death. It is clearly contraindicated to give a patient with diabetes 50 grams of glucose. Mrs. Youman was not able to produce enough insulin to handle the proper breakdown of the sugar she was ingesting in her diet. This was the reason her blood sugar was elevated. To give her additional concentrated sugar would have been extremely detrimental to her as she would not have been able to properly breakdown this sugar in the face of inadequate insulin production from her pancreas and would have caused her to have a huge spike in her serum blood sugar. This could have also resulted in the sudden death of the baby if this test had been carried out.

The plaintiff's expert, James Bernene, M.D., is Board Certified in Endocrinology, Metabolism and Diabetes. He is the Chief of Medicine at the Hospital of Central Connecticut. Dr.

Bernene is expected to testify that, to a reasonable degree of medical certainty, there were several deviations in the care provided to Mrs. Youman which substantially contributed to her death. More specifically, Dr. Bernene is expected to testify that Mrs. Youman was at high risk for the development of gestational diabetes. She was obese, pregnant and in March of 2003, she was in her third trimester. She had a first degree family history of diabetes in both parents.

Dr. Bernene is expected to testify that, to a reasonable degree of medical certainty, Mrs. Youman's healthcare providers should have been aware that Mrs. Youman was at increased risk of developing gestational diabetes and should have carefully monitored her blood glucose, particularly in her third trimester. They failed to do so thereby deviating from the standards of accepted medical care. When Mrs. Youman was found to have an extremely abnormal blood sugar on March 12, 2003, she should not have been sent home from the hospital. Her obstetricians and the nurse midwives for whom they were responsible should have made the diagnosis of gestational diabetes and should have begun timely and proper treatment for her gestational diabetes.

Dr. Bernene is expected to testify that, to a reasonable degree of medical certainty, Dr. Laurie Curry was aware of the elevated blood sugar of 226 at least as of 3/13/03 when the lab results were provided to Thundermist. Dr. Curry did not provide Mrs. Youman with the proper evaluation and treatment at the office visit on 3/18/03. Dr. Curry should have recognized that Mrs. Youman was at grave risk for further deterioration in her condition as a result of gestational diabetes. The history of a markedly elevated fasting blood sugar of 226 was diagnostic of gestational diabetes in this patient until proven otherwise. If Dr. Curry was in doubt about the diagnosis of gestational diabetes, an urgent serum blood sugar should have been obtained that day which, to a reasonable degree of medical certainty, would have again been elevated and should have led to the diagnosis of

gestational diabetes which would have warranted immediate treatment with insulin. Dr. Curry's failure to obtain an urgent serum blood sugar was a deviation from the standard of care.

Dr. Bernene is expected to testify that, to a reasonable degree of medical certainty, Mrs. Youman was profoundly acidemic upon her arrival at the hospital on March 20, 2003, which was likely as a result of both diabetic ketoacidosis and lactic acidosis. The absence of ketones in the laboratory reports for this patient does not exclude the significant presence of diabetic ketoacidosis due the failure of hospital laboratories to test for the presence of the principal ketoacid, beta-hydroxy butyrate which is secreted in diabetic ketoacidosis.

Dr. Bernene is expected to testify that, to a reasonable degree of medical certainty, Mrs. Youman should have been provided with treatment of her diabetes which would have included frequent blood sugar monitoring, diet control and insulin therapy. A consult with an endocrinologist and/or a maternal fetal medicine specialist, should have been requested by her obstetricians to assist in the management of this patient if her obstetricians did not understand the significance of the elevated blood sugar and/or were not able to formulate the proper treatment plan for Mrs. Youman. This was a deviation from the standard of care.

There is a known risk to the fetus in the face of a significant rise in blood sugar such as what occurred with Mrs. Youman. In addition, the non-reactive stress test was a warning that this baby was potentially in jeopardy. The decision by Dr. Curry not to perform an immediate serum blood sugar and the decision not to admit the patient to the hospital for treatment for gestational diabetes fell below the standards of accepted medical practice for a physician treating Mrs. Youman at that time and under those circumstances. It was a deviation from accepted medical practice to delay until the next day before testing this patient's blood sugar which required urgent assessment

and treatment.

Dr. Bernene is expected to testify that, to a reasonable degree of medical certainty, to wait to do testing for sugar the next day because the patient would be in a fasting state was unacceptable given the risks and the availability of testing in a non-fasting state at that time. Furthermore, when Dr. Curry failed to receive the results of the testing that she had ordered for the following day, Dr. Curry took no steps to contact the patient to warn of the risks of gestational diabetes to her and her baby or to admit the patient for testing and treatment. Such conduct fell below the standards of accepted medical practice.

The plaintiff will produce additional expert testimony at trial that will show, more likely than not, that the deaths of Paula Youman and William Youman were proximately caused by the negligence of the defendant. Once a breach of duty has been shown, as above, a causal relation must be established by competent evidence. See Sylvia v. Gobeille, 101 R.I. 76, 79 (1966). In the case at bar, proximate cause may be shown by establishing that the harm to Paula Youman and William Youman would not have occurred but for the defendant's negligence. Schenck, 119 R.I. 510, 514-15 (1977). The plaintiff must produce testimony from which the jury might infer that proper diagnoses and treatment "with reasonable probability would have aided the patient." Id. at 517. The plaintiff's expert testimony on causation "must speak in terms of `probabilities,' rather than `possibilities.'" Sweet v. Hemingway Transport, Inc., 114 R.I. 348, 355. Although absolute certainty is not required, the plaintiff's expert must show that the result "`most probably' came from the cause alleged." Id. (quoting Tabuteau v. London Guarantee & Accident Co., 40 A.2d 396, 398 (Pa. 1945)). Absent such proof, a jury may not speculate about causation. Evans v. Liguori, 118 R.I. 389, 397-98 (1977).

The plaintiff's expert, Elizabeth Laposata, M.D., is Board Certified in Anatomic Pathology and is the former Medical Examiner for the State of Rhode Island. Dr. Laposata was the Medical Examiner for the State at the time this autopsy was performed and, before she was retained as an expert in this case, had reviewed and signed off on Paula Youman's autopsy report. Dr. Laposata is expected to testify that, to a reasonable degree of medical certainty, that the clinical signs and systems exhibited by Mrs. Youman in the days prior to her death, including but not limited to, her elevated blood sugars of 168 on 3/10/03, 226 on 3/12/03, and the report of increased thirst and increased urination during her hospitalization, were all symptoms consistent with her diabetes which required prompt treatment.

Dr. Laposata is expected to testify that, to a reasonable degree of medical certainty, Paula Youman died as a result of the effect of her untreated and severely elevated glucose level which led to severe acidosis, hypertension, and multi- system organ failure. It is likely that Mrs. Youman's metabolic problems started to develop around the time she was becoming short of breath, which would have been at least 24 hours prior to her admission, as reported on the emergency medical run sheet. Mrs. Youman's energy metabolism status became altered, she was no longer able to use glucose as a source of her energy and had to switch over to using fats, which put her into severe hyperglycemia and also severe metabolic acidosis.

Dr. Laposata is expected to testify that, to a reasonable degree of medical certainty, that the findings seen in Mrs. Youman's lungs were not consistent with a significant pneumonia that would have led to her death. The findings seen in the lungs were as result of the intubation and resuscitative efforts. More specifically, the findings in Paula Youman's lungs were consistent with a patient who was suffering from a decreased level of consciousness and had been intubated for

hours prior to death. Furthermore, and based upon the gross and microscopic description of the respiratory system in the autopsy report, there is no evidence of significant pneumonia.

Dr. Laposata is expected to testify that, to a reasonable degree of medical certainty, William Youman died as a result of Paula Youman's untreated severe hyperglycemia, with resulting acidosis, hypertension and multi-system organ failure. There was no evidence in the baby's autopsy report of infection or severe congenital abnormalities that would cause the death of the fetus independent of the severe disease of the mother.

The plaintiff's expert, Drucilla Roberts, M.D., is Board Certified in Anatomic Pathology with a sub-specialty in Placental Pathology. Dr. Roberts is Chief of the Division of Perinatal Pathology at Massachusetts General Hospital. Dr. Roberts is expected to testify that, to a reasonable degree of medical certainty, that there were findings on the placenta that likely increased the susceptibility of this fetus to adverse effects from the maternal hyperglycemia. Maternal hyperglycemia and diabetic ketoacidosis in the mother are known to be associated with a high mortality rate in the fetus.

Dr. Roberts is expected to testify that, to a reasonable degree of medical certainty, it is more probable than not that William died in utero as a result of the severely elevated blood sugar experienced by Paula Youman. There is evidence that the maternal hyperglycemia experienced by Paula Youman which she presented with on March 20, 2003, was not an isolated event. The pathology slides from William's pancreas show evidence of enlarged islet cells. Fetal pancreatic islet cells become enlarged as a result of exposure to chronic hyperglycemia in the mother. In order for the islet cells to become enlarged, the exposure to maternal hyperglycemia would have been for a period of several weeks or longer. In addition, William was noted to have an enlarged heart. This

finding is often present in infants of diabetic mothers. The placental slides do not show evidence of significant infection in the baby. Based upon the cellular findings at autopsy, specifically, the degree of degeneration of the cells obtained from the heart muscle, William appears to have died in utero between 24-48 hours prior to delivery.

Dr. Roberts is expected to testify that during the March 10-12, 2003 admission, Mrs. Youman had symptoms of increased thirst and voiding, which were indicative of gestational diabetes. Such untreated diabetes substantially contributed to the development of severe acidemia and the deaths of Paula Youman and William Youman.

Harlan Giles, M.D,. is expected to testify that, to a reasonable degree of medical certainty, if Mrs. Youman had been provided with the proper care, her elevated blood sugars would have been treated and she would not have gone on to develop severely elevated blood sugar, severe acidosis and multi-organ system failure. Mrs. Youman would have been provided with the supportive care she required for her pancreatitis and statuses of the liver and to a reasonable degree of medical probability she and her unborn baby would not have died. It is more probable than not if Dr. Curry had provided Mrs. Youman with the proper care and treatment, Paula Youman and William Youman would not have died.

Dr. Giles is expected to testify that, to a reasonable degree of medical certainty, if Mrs. Youman had been provided with the proper care, her elevated blood sugar would have been treated and she would not have gone on to develop severely elevated blood sugar, severe acidosis and multi-organ system failure. Mrs. Youman would have been provided with the supportive care she required for her pancreatitis and statuses of the liver and to a reasonable degree of medical probability she and her unborn baby would not have died. If the baby had been under the

surveillance he required based on the medical difficulties being experienced by his mother, when the baby began to show signs that the uterine environment was no longer able to support him, a cesarean section would have been carried out and he would have been delivered. At 32 weeks gestation, to a reasonable degree of medical probability, William Youman would have been healthy or with minimal transient medical issues despite his prematurity.

Dr. Bernene is expected to testify that to a reasonable degree of medical certainty, Mrs. Youman was suffering from a profound fluid deficit (volume depletion) due to extremely elevated blood sugars. It is likely that as of 3/18/03, her blood sugar was above 400. The loss of fluid volume and lack of any insulin therapy over that period were precipitating factors leading to her ketoacidosis. As a result of the severe acidemia experienced by Mrs. Youman, she developed profound hypotension and multi-system organ failure which resulted in her premature death. Dr. Bernene is expected to testify that to a reasonable degree of medical certainty, William Youman also died as a result of the untreated severely elevated blood sugar, acidemia and multi-system organ failure experienced by his mother.

Due to the abovementioned negligence of the defendant and the consequential deaths of Paul Youman and William Youman, the executor of the decedents' estates, has a right to seek redress, in their names, for the wrongful acts which caused their death. R.I. Gen. Laws § 10-7-1, et seq. The plaintiff may seek compensation for pecuniary damages including lost earnings, lost homemaking services, and loss of companionship and society. Id. Additionally, in the calculation of the lost earnings of William Youman, the education and earning capacity of Paula and Scott Youman may be taken into account. Williams v. United States, 435 F.2d 804, 805 (1970).

Scott Youman, father of William Youman, and surviving spouse of Paula Youman, has a

claim against the defendant for ante-mortem loss of consortium. If the defendant's negligence is found to be the cause of the deaths of William Youman and Paula Youman, the defendant is also liable to Scott Youman for the loss of consortium of his son and wife. R.I. Gen. Laws § 9-1-41. This loss of consortium claim does not require any physical manifestation of such injury. Id. All the loss of consortium statute requires is that there be a loss of consortium or society and it be caused by the tortious conduct to a spouse, parent or child. Fritz v. May Dept. Stores Co., 866 F. Supp. 66 (R.I. Dist. 1994). The loss of consortium claim arises from the tortious injury suffered by the spouse. Allstate Ins. Co. v. Pogorilich, 605 A.2d 1318 (1992). The basis of recovery is the loss of services of the wife which grew out of her injury. Golden v. R.L. Green Paper Co., 44 R.I. 231 (1992).

The plaintiff has an additional claim against the defendant physicians for their failure to obtain Paula Youman's informed consent. Had Mrs. Youman known the potential risks involved with her pregnancy she would have sought other avenues of treatment and more likely then not, a second medical opinion. A physician is bound to disclose all known material risks peculiar to the proposed surgery or treatment. The materiality of a risk is the significance a reasonable person, in what the physician knows or should know is his or her patient's position, would attach to the disclosed risk in deciding whether to submit to surgery or treatment. Lauro v. Knowles, 739 A.2d 1183, 1186 (R.I. 1999).

Here, the plaintiff will present expert testimony that the defendant physicians did not obtain and/or provide the appropriate informed consent with respect to their care and treatment of Paula Youman and that their failure to do so was a substantial factor contributing to her injuries and death and that of her unborn child.

G. PENDING MATTERS

1. The plaintiff intends to file a Motion in Limine to Exclude any Reference to the Police or Criminal Record of Paula Youman

H. ESTIMATED TIME OF TRIAL

The plaintiff estimates that he will require five (5) days to present his evidence and that the entire trial will require seven (7) days.

As there is a pending Motion to Continue the Pre-Trial Memoranda Deadline, the plaintiff respectfully reserves the right to amend, supplement and/or modify this Pre-Trial Memorandum based upon the filing of a Pre-Trial Memorandum by the defendant.

Respectfully submitted,
By his Attorneys,
KECHES & MALLEN, P.C.

/s/ Ann Marie Maguire
ANN MARIE MAGUIRE

/s/ Charlotte E. Glinka
CHARLOTTE E. GLINKA
122 Dean Street
Taunton, MA 02780
(508) 822-2000

DATED: February 8, 2008
PTM