**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **SCOTT F. YOUMAN, Sr., Individually and as Administrator of the Estates of PAULA J. YOUMAN and WILLIAM P. YOUMAN, Plaintiff,** | ) | |
| **v.** | ) | **C.A. NO. CA 05-535T** |
| **UNITED STATES OF AMERICA, Defendant.** | ) | |

**DEFENDANT'S PRE-TRIAL MEMORANDUM**

In accordance with the Court's Pretrial Order dated November 14, 2007, Defendant United States of America submits the following memorandum.

**A. Parties**

The United States will be represented at trial by United States Attorney Robert Clark Corrente and Assistant United States Attorney Dulce Donovan.

**B. Facts**

The case involves the care provided by physicians at the Thundermist Health Center[1] in Woonsocket, Rhode Island to Paula Youman in the last ten days of her pregnancy.

In late 2002, Ms. Youman became pregnant with her third child. At the time of her pregnancy, Ms. Youman had a history of bipolar disorder and asthma, had been disabled and unable to work since 1999, and had been receiving social security disability since 2000. Based on her bipolar disorder and asthma, the care providers at Thundermist recommended to Ms. Youman that her care be transferred to the Maternal Fetal Medicine Center at Women and Infants

---

[1] Thundermist Health Center is a federally funded health center and thus falls within the coverage of the Federal Tort Claims Act pursuant to 42 U.S.C. § 233(g)-(n) and 28 U.S.C. §§ 1346(b), 2401(b), 2671-2680.

Hospital. Ms. Youman refused the transfer citing her inability to obtain transportation and child care issues.

On January 16, 2003, a one-hour glucose challenge test performed at 24-weeks gestation demonstrated a value of 121 mg/dl – well within normal limits.[2] On March 2, 2003, Ms. Youman tested positive for significant protein in her urine, suggesting preeclampsia.[3] Thereafter, beginning on March 7, 2003, Dr. Lisa Jones instructed Ms. Youman to remain on bed rest and undergo twice weekly nonstress tests.

On March 10, 2003, Dr. Jones referred Ms. Youman to Landmark Hospital due to concerns that she might be going into premature labor. Upon arrival at the hospital, Ms. Youman was found to have a blood sugar level of 168.

On March 12, 2003, while Ms. Youman was still hospitalized at Landmark, a blood serum drawn at 6:30 in the morning showed an elevated blood glucose level for Ms. Youman of 226. Prior to this blood serum being drawn, dexamethasone and terbutaline had been administered to her, both of which are known to transiently increase blood sugar levels. Ms. Youman was discharged on the morning of the 12th, at which time a follow-up appointment was scheduled for her at Thundermist the next day.

---

[2] The one-hour glucose challenge test is performed between 24 and 28 weeks of pregnancy in order to determine if the pregnant mother is developing gestational diabetes.

[3] Preeclampsia is the development of elevated blood pressure and protein in the urine after the 20th week of pregnancy. http://www.nlm.nih.gov/medlineplus/ency/article/000898.htm.

On March 13, 2003, Ms. Youman underwent a reactive non-stress test at Thundermist.[4] Also on March 13, 2003, Thundermist received the lab results reporting Ms. Youman's 226 blood sugar level.

At this point in her care, Ms. Youman was still being seen twice per week because of Dr. Jones' earlier concerns that she might be developing preeclampsia. Thus, March 18th was Ms. Youman's next appointment at Thundermist. At that time she was seen by Dr. Elizabeth Curry. Ms. Youman's urine test revealed a 4+ glycosuria.[5] Based on the 4+glycosuria in her urine, and her prior elevated blood sugar levels, Dr. Curry informed Ms. Youman about the sugar in her urine and asked her to come back in the morning to do a fasting glucose screen. In addition, while at Thundermist, Ms. Youman had a nonreactive nonstress test. Accordingly, Dr. Curry sent her to Landmark for further evaluation. At Landmark, Ms. Youman's nonstress test was reactive (normal).

Ms. Youman did not go to Thundermist on the 19th to have lab work done. Instead, on March 20th at approximately 11:00 a.m., Ms. Youman was transported by ambulance to Landmark Hospital, complaining of shortness of breath and diffuse abdominal pain. Her blood pressure was 119/94. When she arrived at the hospital, she had fever of 100.8, a high respiratory

---

[4] A nonstress test, (NST) is the monitoring of the response of the fetal heart rate to fetal movements by cardiotocography; a reactive (normal) test consists of two or more fetal movements occurring within 20 minutes accompanied by acceleration of the fetal heart rate by at least 15 beats per minute for at least 15 seconds with a long-term variability of at least 10 beats per minute. Dorland's Medical Dictionary 1681 (28th ed. 1994) (hereinafter "Dorland's").

[5] Glucose is the end product of carbohydrate metabolism and is the chief source of energy for living organisms, its utilization being controlled by insulin. Dorland's at 703. Glucose should not be detectable in the urine. http://www.nlm.nih.gov/medlineplus/ency/article/003581.htm. 1+ corresponds to roughly 200-500 mg/24 hours, 2+ to 0.5-1.5 gm/24 hours, 3+ to 2-5 gm/24 hours, and a 4+ represents 7 gm/24 hours or greater. http://www-medlib.med.utah.edu/WebPath/TUTORIAL/URINE/URINE.html.

rate, an elevated white blood cell count and a plasma glucose of 1202. The fetus evidenced no cardiac activity. She was experiencing renal failure and her electrolytes showed metabolic acidosis. Shortly after her arrival at the hospital, due to respiratory failure, she was intubated and her fever rose to 104. She was also placed on a pulmonary artery catheter. Ms. Youman remained acidotic despite the administration of intravenous fluids. At 6:00 the following morning she spontaneously delivered her stillborn son. Ms. Youman was also diagnosed with pancreatitis and diabetic ketoacidosis. Due to the possibility of infection, she was started on a series of antibiotics.

After she delivered her son, Ms. Youman's blood pressure began a steady decline. She was severely dehydrated and attempts were made to restore her fluid volume. However, Ms. Youman died on March 21, 2003, at approximately 2:30 in the afternoon. The autopsy report for Ms. Youman listed as the cause of death multi-system organ failure associated with pneumonia, acute necrotizing pancreatitis, fatty liver, sepsis,[6] and severe hyperglycemia. The fetal autopsy report listed "severe metabolic derangements of the mother" as the cause of death.

## C. <u>Defenses</u>

### 1. Ms. Youman's Care Providers Did Not Breach the Standard of Care In Their Treatment of Her

The United States maintains that Ms. Youman's Thundermist care providers rendered treatment to her that was well within the standard of care. The Complaint names three Thundermist care providers – Drs. Lisa Jones, Laurie Curry and Elizabeth Behler. Of these three,

---

[6] Sepsis is a serious medical condition caused by the body's response to an infection. Sepsis can lead to widespread inflammation and blood clotting. Inflammation may result in redness, heat, swelling, pain, and organ dysfunction or failure. http://www.clevelandclinic.org/health/health-info/docs/3800/3887.asp?index=12361

only Dr. Curry's actions are at issue. Dr. Behler was not a Thundermist employee and Dr. Jones did not care for Ms. Youman during her March 10th admission and was out of the country from March 16th through March 23rd.

Dr. Curry's actions in treating Ms. Youman in the last few days of her life did not deviate from the standard of care. Ms. Youman's 24-week, one-hour glucose challenge test demonstrated a value of 121 mg/dl – well within normal limits. The blood sugar levels which Ms. Youman exhibited on March 10th and March 12th did not warrant emergent treatment. Dr. Curry was closely monitoring Ms. Youman's medical condition – she was seen on the 13th and on the 18th. When Ms. Youman's urine test revealed a 4+ glycosuria, Dr. Curry's treatment plan included bringing her back the next day for further testing. The 4+ glycosuria in Ms. Youman's urine did not warrant emergency treatment. The only issue which presented itself on the 18th and which required immediate attention was the non-reactive stress test. Dr. Curry appropriately referred Ms. Youman to Landmark Medical Center for further evaluation. The result of that further evaluation was a reactive stress-test which indicated Ms. Youman's fetus was alive and healthy.

**2. Any Alleged Breach of the Standard of Care by Ms. Youman's Care Providers Did Not Cause the Death of Either Ms. Youman or Her Fetus**

The deaths of Ms. Youman and her fetus were tragic – but not the fault of Thundermist care providers. Although Ms. Youman's blood sugars were likely elevated in the last few days of her life, the failure to treat her in an emergent manner did not cause her death. Ms. Youman's death was the result of some type of bacterial infection, likely pneumonia, which she developed in the last few days of her life and which caused an increased resistence to insulin. This

increased resistence to insulin resulted in the severely elevated glucose level she presented with at Landmark on March 20th. This resistence to insulin and her infection caused Ms. Youman's metabolism to become unstable and resulted in her becoming dehydrated and her organs failing, which caused her death and the death of her fetus.

**3. Ms. Youman's Care Providers Were Not Negligent in Failing to Inform Ms. Youman of the Risks Involved in Her Treatment**

Neither of Ms. Youman's blood sugar levels on March 10th or 12th warranted immediate treatment. When Ms. Youman presented on March 18th with a 4+ glycosuria in her urine, Dr. Curry recognized the need to retest her for gestational diabetes and instructed her to return to the clinic the following day for testing. Ms. Youman's 4+ glycosuria did not require emergency treatment. Since there were no risks involved to Ms. Youman or her fetus in waiting to follow-up with Ms. Youman until her regularly scheduled appointment on March 18th, or waiting until March 19th to conduct additional glucose testing, there was no material information concerning the course of treatment which Ms. Youman's care providers were required to convey to her.

**4. Any Injuries Suffered by Ms. Youman and Her Fetus Were Due In Part to Ms. Youman's Own Negligence**

On March 19, 2003, when Ms. Youman's urine test revealed a 4+ glycosuria, Dr. Curry's treatment plan included bringing her back in the next day for further testing. Ms. Youman did not come in for testing. Had she done so, her care providers at Thundermist could have provided some medical intervention which likely would have saved her life and the life of her fetus. In addition, Ms. Youman had been having difficulty breathing for approximately 24-hours prior to her admission to Landmark on March 20th, and she had not felt the fetus move that morning. Had Ms. Youman sought medical treatment on the 19th or as soon as she realized the fetus was

not moving on the 20th, medical intervention could have been provided which likely would have saved her life and the life of her fetus.

**5. Plaintiff's Damages, If Any Proven, Are Limited to the Amount Claimed in the Administrative Claim Pursuant to 28 U.S.C. § 2675(b)**

In their administrative claim, Plaintiffs sought damages in the following amounts: (1) Scott Youman individually and as administrator of the Estate of Paula Youman, $500,000 for antemortem loss of consortium and $3,500,000 for wrongful death; and (2) Scott Youman as Administrator of the Estate of William Youman, $2,500,000 for wrongful death. Thus, pursuant to 28 U.S.C. § 2675(b), Plaintiffs right to recovery in this action is limited to the amounts listed above.

**6. Plaintiffs Have No Right to a Jury Trial in this Action**

Although Plaintiffs included a jury demand in their Complaint, because this is a Federal Tort Claims Act suit, 28 U.S.C. 1346 § et seq., against the United States, pursuant to 28 U.S.C. § 2402, this is a nonjury trial.

**7. Plaintiffs Are Proscribed From Recovering Any Amount for Prejudgment Interest Against the Defendant**

In the Complaint, Plaintiffs seek "damages, plus interests and costs." Pursuant to 28 U.S.C. § 2674, prejudgment interest is not available in tort suits against the United States.

**E. Issues**

1. Whether Dr. Jones breached the standard of care in treating Ms. Youman.

2. Whether Dr. Jones' alleged breach of the standard of care caused the death of Ms. Youman's fetus.

3. Whether Dr. Jones' alleged breach of the standard of care caused the injuries to, and death of, Paula Youman.

4. Whether Dr. Curry breached the standard of care in treating Ms. Youman.

5. Whether Dr. Curry's alleged breach of the standard of care caused the death of Ms. Youman's fetus.

6. Whether Dr. Curry's alleged breach of the standard of care caused the injuries to, and death of, Paula Youman.

7. Whether Dr. Jones failed to obtain Paula Youman's informed consent.

8. Whether Dr. Jones' alleged failure to obtain Paula Youman's informed consent caused the death of Ms. Youman's fetus.

9. Whether Dr. Jones alleged failure to obtain Paula Youman's informed consent caused Ms. Youman's injuries and death.

10. Whether Dr. Curry failed to obtain Paula Youman's informed consent.

11. Whether Dr. Curry's alleged failure to obtain Paula Youman's informed consent caused the death of Ms. Youman's fetus.

12. Whether Dr. Curry's alleged failure to obtain Paula Youman's informed consent caused Ms. Youman's injuries and death.

13. Whether Ms. Youman was contributorily negligent in causing the injuries to herself and her fetus.

14. Whether Ms. Youman was contributorily negligent in causing her death and the death of her fetus.

15. Whether an award of damages based on Ms. Youman's lost earnings is appropriate given the fact that she had not worked for several years before her death and had been declared permanently and totally disabled.

16. Whether due to Ms. Youman's disability some diminution of damages based on the value of loss of household services is appropriate.

17. Whether in calculating an award of damages for the lost earning capacity of the fetus, an award of damages for years preceding the date on which he would have turned twenty-one is appropriate.

18. Whether in calculating an award of damages for the lost earning capacities of Paula Youman and her fetus it is appropriate to calculate damages based on work life capacity or expectancy.

**F. Arguments**

**(1) Liability Under the FTCA**

This negligence action is brought against the United States of America pursuant to the Federal Tort Claims Act (FTCA). 28 U.S.C. §§ 1346, 2671, et seq. The FTCA is a limited waiver of the United States' sovereign immunity that allows the federal government to be sued for causes of action sounding in tort under the terms and conditions defined by the statute. United States v. Orleans, 425 U.S. 807, 814 (1976). Pursuant to the FTCA, the United States is liable for injuries:

> caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

"In deciding the manner and extent to which a private individual would be liable, the law of the place where the act or omission occurred must be applied." Soto v. United States, 11 F.3d 15, 17 (1st Cir. 1993)("a court must apply the 'law of the place' where the negligent act occurred."). Thus, when deciding whether the defendant or its employees were negligent, the Court must examine Rhode Island law.

**(2) Rhode Island Medical Negligence Law**

In a medical malpractice case, as in any negligence action, a plaintiff must prove that the defendant had a duty to act or refrain from acting, that the defendant breached that duty, and that the breach proximately caused plaintiff's injuries. See generally, Schenck v. Roger Williams General Hospital, 382 A.2d 514, 516-17 (R.I. 1977). The Rhode Island Supreme Court has repeatedly held that "a physician's duty is not to cure, but to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice have and exercise in like cases." Id. In undertaking to care for a patient, a physician does not guarantee a successful treatment. Wilinkson v. Vesey, 295 A.2d 676 (R.I. 1972); Young v. Park, 417 A.2d 889, 893 (R.I. 1980). In what has become known as the medical judgment doctrine, the Rhode Island Supreme Court has held that as long as a physician exercises the applicable degree of care, he or she may choose between differing accepted methods of treatment and not be held liable. See e.g. Coleman v. McCarthy, 165 A. 900, 902 (R.I. 1933). In DiFranco v. Klein, 657 A.2d 145, 148 (R.I. 1995), the court restated and reaffirmed that principle:

> When a physician exercises the same degree of skill and diligence which is commonly possessed by other physicians in good standing, who are engaged in the same type of practice in similar localities, he or she is not negligent in choosing a treatment that later proves to be unsuccessful so long as the treatment chosen was an appropriate treatment based on the information then available to a reasonably prudent doctor in like circumstances. (Citations omitted.)

In the instant case, the United States intends to call Dr. Marshall Carpenter, an expert in maternal fetal medicine and obstetrics and gynecology, to testify that the care provided by Ms. Youman's Thundermist care providers was within the standard of care. Dr. Carpenter is expected to testify that Dr. Curry chose an appropriate course of treatment for Ms. Youman in the last two weeks of her life. Specifically, Ms. Youman was being followed closely and being seen twice per week. Dr. Carpenter is expected to testify that the elevated blood sugars Ms. Youman had on March 10th and 12th did not present an emergency and Dr. Curry's decision to follow up on the 19th with additional glucose testing was an acceptable method of treatment, thus within the standard of care. Furthermore, Dr. Carpenter is expected to testify that Ms. Youman's death was not caused by Dr. Curry's decision to conduct further glucose testing on March 19th. Instead, Dr. Carpenter is expected to testify that Ms. Youman's death was the result of an infection which she developed in the last few days of her life and which increased her insulin resistence, thus causing the spike in her blood glucose level, and her attendant multisystem organ failure.

**(3) Lack of Informed Consent**

Plaintiffs also allege that Ms. Youman's care providers at Thundermist failed to obtain her informed consent as to her course of treatment. Under the doctrine of informed consent, a physician must communicate to a patient "all the known material risks peculiar to a proposed

procedure unless those risks are likely to be known to the average patient or are in fact known to the particular patient." Beauvais v. Notre Dame Hospital, 387 A.2d 689, 691 (R.I. 1978). Accord, Kenny v. Wepman, 753 A.2d 924, 926 (R.I. 2000), quoting Flanagan v. Wesselhoeft, 712 A.2d 365, 371 (R.I. 1998). Plaintiffs must also prove "that the undisclosed material risk did in fact occur and that plaintiff would not have undergone the procedure if advised of that risk." Beauvais, 387 A.2d at 691, citing Wilkinson v. Vesey, 295 A.2d 676, 690 (R.I. 1972).

Ms. Youman's care providers did not fail to disclose to Ms. Youman material risks in their chosen course of treatment of her. Dr. Carpenter is expected to testify that the fact that Dr. Curry first ordered additional blood glucose testing on March 18th, as opposed to earlier when she might have become aware of Ms. Youman's March 10th and 12th blood sugar levels, did not present material risks to Ms. Youman's health. Similarly, Dr. Carpenter is expected to testify that Dr. Curry's decision on March 18th to reevaluate Ms. Youman's blood sugar levels on March 19th did not pose a material risk to Ms. Youman. Thus, in both instances, Dr. Curry was not required to obtain Ms. Youman's informed consent to wait to conduct further blood glucose testing.

**(4) Ms. Youman Was Contributorily Negligent**

Under Rhode Island law, in negligence actions a plaintiff's award is diminished in proportion to her own negligence. R.I. Gen. L. § 9-20-4. In this case, Dr. Curry had instructed Ms. Youman to return to Thundermist on the 19th to have her glucose testing done. Ms. Youman did not return to the clinic the following day despite Dr. Curry's instructions. In addition, twenty-four hours prior to being transported to Landmark Medical Center, Ms. Youman

had been having difficulty breathing. Further, she had not felt her fetus move on the morning of March 20th. Ms. Youman had a duty to exercise reasonable care in caring for herself and her fetus and seek medical treatment at those times. Had she come in for lab work on March 19th as Dr. Curry had instructed or had she sought medical treatment on March 19th, it is likely that medical intervention would have been provided which would have prevented her death and the death of her fetus.

**(5) Since Ms. Youman Was Permanently Disabled At the Time of her Death, An Award for Lost Earning Capacity is Not Appropriate**

At the time of her death, Ms. Youman had been totally disabled since 1999 based on her bipolar disorder. She had been receiving social security disability benefits for approximately three years prior to her death.

Rhode Island General Laws § 10-7-1.1 specifies that in determining the pecuniary damages awardable in a wrongful death action, the court is to "determine the gross amount of the decedent's prospective income or earnings over the remainder of his or her life expectancy." Because Ms. Youman had been completely disabled for over three years prior to her death, there is no basis upon which to award damages based on her lost earning capacity pursuant to § 10-7-1.1.

**(6) Since Ms. Youman Was Permanently Disabled At the Time of Her Death, An Award of Damages Based on the Lost Value of Homemaking Services Should Reflect This Fact**

Ms. Youman's bipolar disorder not only impacted her ability to work, but her ability to function at home. At the time of her death, she had been hospitalized several times over the

years due to her mental illness. The value of homemaking services, the calculation of which is appropriate under Rhode Island General Laws § 10-7-1.1, should reflect how Ms. Youman's illness impacted her ability to carry out her homemaking services.

**(7) Any Calculation of Damages For Ms. Youman's Fetus's Lost Earning Capacity Should Commence On the Date He Would Have Turned 21**

In Rhode Island, the only relevant earnings of the decedent are those which occur after the decedent would have turned twenty-one. See Williams v. United States, 435 F.2d 804, 805-06 (1st Cir. 1970); Dimitri v. Peter Cienci & Son, 103 A. 1029 (R.I. 1918). Thus, any calculation of damages based on the lost earning capacity of Ms. Youman's fetus must calculate lost earning capacity from the point in time at which he would have turned twenty-one.

**(8) Any Calculation of Lost Earning Capacity For Either Ms. Youman or Her Fetus Should Be Based on Their Work Life Expectancy, Not Work Life Capacity**

Plaintiffs intend to call Dr. Arthur Wright to testify as to the amount of lost earnings for both Ms. Youman and her fetus. Dr. Wright based his calculations on Ms. Youman's and her fetus's work life capacities, rather than their work life expectancies. In Rhode Island, courts typically look to the decedent's work life expectancy in determining the amount of damages awardable pursuant to Rhode Island General Laws § 10-7-1.1. See e.g. Romano v. Duke, 304 A.2d 47, 51 (R.I. 1973); Hatch v. Burke, 1980 WL 336030 ( R.I. Super. Feb. 5, 1980). Thus, Dr. Wright's calculations should reflect Ms. Youman's and her fetus's work life expectancies, not their work life capacities.

**G. Pending Matters**

Undersigned counsel is unaware of any matters currently pending before the Court.

**H. Estimated Time of Trial**

The United States estimates trial in this matter to take four days.

FOR DEFENDANT:
United States of America,

/s/ Dulce Donovan

ROBERT CLARK CORRENTE
United States Attorney
DULCE DONOVAN
Assistant United States Attorney
Chief, Civil Division
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000
(401) 709-5017 (fax)
Email: dulce.donovan@usdoj.gov

CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 15th day of February, 2008, I electronically filed the within Defendant's Pre-Trial Memorandum, with the Clerk of the United States District Court for the District of Rhode Island, using the CM/ECF System. The following participants have received notice electronically:

Charlotte Glinka, Esq.
KECHES & MALLEN, P.C.
122 Dean Street
Taunton, MA 02780

Jeffrey M. Padwa, Esq.
303 Jefferson Blvd.
Warwick, RI 02888

/s/ Dulce Donovan
DULCE DONOVAN
Assistant U.S. Attorney
Chief, Civil Division
United States Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5017 (fax)
Email: dulce.donovan@usdoj.gov