**Donald E. SCHENCK, Executor of the Estate of Adolph E. Schenck**

**v.**

**ROGER WILLIAMS GENERAL HOSPITAL and Leocadia C. Flynn, Executrix of the Estate of Joseph C. Flynn.**

**No. 75-244-Appeal.**

Supreme Court of Rhode Island.

Dec. 9, 1977.

Petition for Reargument Denied Jan. 12, 1978.

Medical malpractice action was brought against hospital and physician's estate to recover for injuries allegedly suffered by patient from misdiagnosis of heart attack. The Superior Court, Providence and Bristol Counties, Grande, J., granted defendants' motions for directed verdict at the close of plaintiff's case, and plaintiff appealed. The Supreme Court, Bevilacqua, C. J., held that: (1) evidence of causal connection between failure to properly diagnose patient's heart attack and patient's condition of organic brain syndrome was sufficient for jury and (2) trial court erred in refusing to permit expert witness who practiced medicine primarily in New York City and who was specialist in cardiology from testifying as to whether hospital was negligent in failing to equip emergency room with electrocardiogram machine.

Reversed and remanded.

**1. Appeal and Error ⚩927(7)**

In reviewing granting of defendant's motion for directed verdicts, appellate court, not trial court, is bound to consider evidence in light most favorable to plaintiff without weighing it or assessing credibility of witnesses, to give plaintiff benefit of all reasonable inferences flowing from evidence and to leave determination of any inconsistencies or discrepancies in testimony adduced by plaintiff to jury.

**2. Physicians and Surgeons ⚩18.60**

In any negligence action, such as a medical malpractice case, it is plaintiff's burden to establish that defendant had duty to act or refrain from acting and that there was a causal relation between act or omission of defendant and injury to plaintiff.

**3. Negligence ⚩56(1.2)**

Proximate cause may be established in most cases by showing that harm to plaintiff would not have occurred but for defendant's negligence.

**4. Negligence ⚩134(11)**

Causal connection between defendant's negligence and harm to plaintiff must be established by competent evidence.

**5. Negligence ⚩136(25)**

Absent proof of causal connection between defendant's negligence and harm to plaintiff, verdict for plaintiff in negligence action would be based on conjecture and speculation and, in such circumstances, defendant is entitled to directed verdict.

**6. Physicians and Surgeons ⚩14(4)**

Standard of care imposed upon physician of exercising same degree of diligence and skill as physicians in good standing engaged in same type of practice in similar localities ordinarily have and exercise in like cases governs a physician's conduct at all times while patient is under his care and includes diagnosis as well as treatment of patient's ailment.

**7. Physicians and Surgeons ⚩15(7)**

Requirement that physician avail himself of all scientific means and facilities available to obtain best factual data upon which to make diagnosis does not impose greater burden upon physician at diagnostic stage of medical care than during actual treatment; in both instances, conduct of physician is measured by that degree of diligence and skill possessed by other physicians in similar localities.

**8. Physicians and Surgeons ⚩15(7)**

When a physician fails to conduct a test, consult a report or perform an examination, that is, to utilize scientific means of

diagnosis at his disposal and there is competent evidence indicating other skilled physicians in similar localities would employ such resources, diagnostician is not employing tools of his profession in skillful manner required of him by law and is negligent.

**9. Physicians and Surgeons ⚯18.90**

Evidence of causal connection between failure to properly diagnose heart attack of 67-year-old patient, who experienced severe pains in arms and chest and collapsed and who was taken to hospital, diagnosed at hospital as having heat exhaustion and given medication for that condition and who was released and returned home where he again collapsed and became semicomatose and nonreactive, and patient's condition of organic brain syndrome was sufficient for jury in medical malpractice action.

**10. Appeal and Error ⚯971(2)**
**Evidence ⚯546**

Whether witness is qualified to express expert opinion is matter addressed to sound discretion of trial justice and exercise of that discretion will not be disturbed by appellate court absent a showing of abuse.

**11. Physicians and Surgeons ⚯14(4)**

Medical profession's standard of care is exercise of same degree of care and skill as that which is ordinarily employed by profession under same conditions in similar localities.

**12. Evidence ⚯538**

Experts from other localities may testify as to medical profession's standard of care provided such localities are sufficiently similar.

**13. Evidence ⚯538**

Providence and New York City are similar localities for purposes of expert medical testimony about medical profession's standard of care.

**14. Evidence ⚯538**

Fact that witness was specialist in cardiology and not in hospital administration or emergency room care might have affected weight given his testimony concerning whether hospital was negligent in failing to equip emergency room with electrocardiogram machine but not his competency to testify.

**15. Evidence ⚯538**

Trial court erred in medical malpractice action in refusing to permit expert witness who went to medical school in Chicago and practiced medicine primarily in New York City and who was specialist in cardiology to testify as to whether defendant hospital was negligent in failing to equip emergency room with electrocardiogram machine.

**16. Evidence ⚯537**

Cardiologist's lack of training or experience in field of psychiatry might have affected weight of his testimony as to patient's psychiatric problems but not his competency to testify as to those problems in medical malpractice action.

---

Roberts & Willey, Bruce G. Tucker, Providence, for plaintiff.

Carroll, Kelly & Murphy, Joseph A. Kelly, Providence, for Roger Williams General Hospital.

Hinckley, Allen, Salisbury & Parsons, Thomas D. Gidley, Providence, for Leocadia C. Flynn, Executrix of the Estate of Joseph C. Flynn.

## OPINION

BEVILACQUA, Chief Justice.

This is an appeal from a judgment entered in Superior Court granting the defendants' motions for directed verdicts at the close of the plaintiff's case in a civil action for medical malpractice.

The action was instituted by plaintiff, Donald E. Schenck, executor of the estate of Adolph E. Schenck, against defendants, Roger Williams General Hospital and Leocadia C. Flynn, executrix of the estate of Joseph C. Flynn, to recover damages for personal injuries suffered by plaintiff's de-

cedent which were allegedly caused by defendants' negligence.[1]

The record discloses that, prior to the events of June 13, 1969, plaintiff's decedent, Adolph E. Schenck, was, except for a well-controlled condition of Parkinson's disease, a healthy 67-year-old widower who lived alone. On the afternoon of June 13, 1969, Mr. Schenck, who had been working in his garden, experienced severe pains in his arms and chest and apparently collapsed. He summoned the Smithfield emergency squad, and they administered oxygen before taking him to Roger Williams General Hospital shortly after 3:00 p.m. He was examined at the hospital by Dr. Joseph C. Flynn, who diagnosed his condition as heat exhaustion and gave him medication for that condition.[2] Mr. Schenck was then released and he returned to his home. Shortly after arriving there, Mr. Schenck again collapsed and became semicomatose and nonreactive. He was taken back to the hospital about 5:00 p.m. This time his condition was diagnosed as acute myocardial infarction (a heart attack).

Testimony indicated that prior to the events of June 13, 1969, Mr. Schenck had been in relatively good health, but that after that time, until his death in February 1971, he suffered from confusion, disorientation and over-aggressive behavior. The plaintiff's expert referred to this condition as "organic brain syndrome."

The plaintiff alleges that Mr. Schenck's condition was misdiagnosed the first time he was taken to the hospital and that he had actually been suffering from a heart attack at that time, not heat exhaustion. He also alleges that this mistaken diagnosis was due to defendants' negligence and caused Mr. Schenck's subsequent mental disorder.

Trial was had before a jury in Superior Court, and at the close of plaintiff's evidence both defendants moved for directed verdicts. The trial justice granted these motions on the ground that there was no evidence from which the jury could reasonably infer that the alleged misdiagnosis was the proximate cause of Mr. Schenck's mental disorder. Plaintiff appeals from the judgment entered pursuant to the granting of these motions as well as from certain evidentiary rulings by the trial justice.

I

[1] In reviewing the granting of defendants' motions for directed verdicts,

> "this court, like the trial court, is bound to consider the evidence in a light most favorable to plaintiff without weighing it or assessing the credibility of the witnesses, to give plaintiff the benefit of all reasonable inferences flowing from the evidence, and to leave the determination of any inconsistencies or discrepancies in the testimony adduced by plaintiff to the jury." *Wilkinson v. Vesey,* 110 R.I. 606, 612, 295 A.2d 676, 681 (1972).

Before considering the evidence, the trial justice noted that medical malpractice may consist of the negligent failure to make a proper diagnosis. *See Wilkinson v. Vesey, supra* at 612–13, 295 A.2d 682. She further stated that the act of malpractice, misdiagnosis in this case, must be shown to be a proximate cause of the injury to support a recovery. After evaluating the testimony of plaintiff's expert witness, the trial justice concluded that the evidence could not prove or support an inference that the alleged malpractice of defendants was the proximate cause of Mr. Schenck's injuries. It is this ruling that plaintiff most strongly disputes.

[2–5] In any negligence action, such as a medical malpractice case, it is the plaintiff's burden to establish that the defendant had a duty to act or refrain from acting and that there was a causal relation between

1. Prior to the close of plaintiff's case, plaintiff voluntarily dismissed the action against several other defendants.

2. The medication administered was sparine, and there was testimony that some risk was involved in giving this drug to a person with a circulatory problem, i. e., a possible heart attack. However, no testimony was introduced which indicated that the sparine had any relation to what later happened to Mr. Schenck.

the act or omission of the defendant and the injury to the plaintiff. *Presley v. Newport Hosp.,* 117 R.I. 177, 365 A.2d 748 (1976). Proximate cause may be established in most cases by showing that the harm to the plaintiff would not have occurred but for the defendant's negligence. *Salk v. Alpine Ski Shop, Inc.,* 115 R.I. 309, 342 A.2d 622 (1975). Moreover, such causal connection must be established by competent evidence. *Sylvia v. Gobeille,* 101 R.I. 76, 220 A.2d 222 (1966). Absent such proof, a verdict for the plaintiff would be based on conjecture and speculation, and in such circumstances the defendant would be entitled to a directed verdict. *Evans v. Liguori,* R.I., 374 A.2d 774 (1977).

**[6]** In medical malpractice cases, this court has repeatedly held that a physician's duty is not to cure, but to exercise the same degree of diligence and skill as physicians in good standing engaged in the same type of practice in similar localities ordinarily have and exercise in like cases. *Marshall v. Tomaselli,* R.I., 372 A.2d 1280 (1977); *Wilkinson v. Vesey, supra; Bigney v. Fisher,* 26 R.I. 402, 59 A. 72 (1904). This standard of care governs a physician's conduct at all times while a patient is under his care and includes the diagnosis as well as the treatment of the patient's ailment. With regard to the diagnosis of patient maladies, we expounded upon the standard of care required of a physician by stating in *Wilkinson* that he must "avail himself of all the scientific means and facilities available to him so that he can obtain the best factual data upon which he can make a diagnosis * * *." *Wilkinson v. Vesey, supra,* 110 R.I. at 615–16, 295 A.2d at 683.

We are aware that once *Wilkinson* was published, concern was publicly expressed that "if a doctor is to be safe, he may be legally required, no matter what the patient's symptoms may be, to examine his patients in all cases for all possible maladies to which the human race falls victim." [3] Such a sentiment takes an extremely literalistic view of *Wilkinson* because it appears to overlook *Wilkinson's* factual background and the posture in which the case came before this court.

In *Wilkinson* we were considering the grant of the defendants' motion for a directed verdict. In such circumstances we were required, as we are in this case, to view the evidence in the light most favorable to the plaintiff.

Winifred Wilkinson's malady had been diagnosed by the defendant radiologists as a malignant tumor. The defendants then embarked upon a course of deep x-ray therapy treatments without the benefit of any biopsy. The defense conceded that a biopsy was a well-recognized diagnostic tool for determining the presence of a malignancy. Several years later, when the patient sought surgical relief from the severe burns caused by the therapy, biopsies showed no malignancy. Viewing the results of the biopsy in the light most favorable to the plaintiff, the inference could have been drawn that Winifred did not have a malignancy and the radiologists had misdiagnosed her ailment.

**[7, 8]** The rule calling for use of all available scientific aids does not impose a greater burden upon a physician at the diagnostic stage of medical care than during actual treatment. In both instances, the conduct of a physician is measured by that degree of diligence and skill possessed by other physicians in similar localities. While this court in *Wilkinson* never contemplated that a physician, in making a diagnosis, would be required to rule out any and " 'all possible maladies to which the human race falls victim,' " it did recognize that in order to assess intelligently his patient's condition, a physician should employ the scientific advancements available to him. When a physician fails to conduct a test, consult a report, or perform an examination, i. e.,

3. The Evening Bulletin, December 19, 1972 at 1, with a pagewide headline reading, "Malpractice Decision Threatens R.I. Medical Costs," quotes a report given to the Hospital Association of Rhode Island by the Association's counsel. The quote to which we have referred in this opinion can be found in the newspaper article.

utilize the scientific means of diagnosis at his disposal, and there is competent evidence which indicates other skilled physicians in similar localities would employ such resources, the diagnostician is not employing the tools of his profession in the skillful manner required of him by law. It is this kind of conduct, and no other, which the court in *Wilkinson* held to be evidence of negligence.

In malpractice suits where the negligence complained of consists of an act of omission, as in the instant case, causation is frequently difficult to ascertain and prove. *Robinson v. Gatti,* 115 Ohio App. 173, 184 N.E.2d 509 (1961), *appeal dismissed,* 172 Ohio St. 477, 178 N.E.2d 511 (1961); *Kuhn v. Banker,* 133 Ohio St. 304, 13 N.E.2d 242 (1938).

> "The question of proximate cause of injury is in very many cases difficult of determination. It is not a question of science or legal knowledge * * * but one to be decided upon common sense principles in the light of the surrounding facts and circumstances of the case under consideration. * * *. The true rule is that what is proximate cause of an injury is ordinarily a question for the jury. It is only when the facts are undisputed and are susceptible of but one inference, that the question is one of law for the court * * *." *Mayor & City Council v. Terio,* 147 Md. 330, 335, 128 A. 353, 355 (1925). *See also* 57 Am.Jur.2d *Negligence* §§ 136 and 137 (1971).

It is generally held that if a fair preponderance of the evidence discloses facts and circumstances proving a reasonable probability that the defendant's negligence was the proximate cause of the injury, the plaintiff has satisfied his burden of proof. Annot., 13 A.L.R.2d 11 (1950). Where negligent diagnosis is alleged, it has generally been held that the plaintiff must produce testimony from which the jury might infer that proper diagnosis and treatment with reasonable probability would have aided the patient. *See Connellan v. Coffey,* 122 Conn. 136, 139–40, 187 A. 901, 902–03 (1936); Annot., 13 A.L.R.2d at 112.

The issue with which we are confronted in the instant case is whether there was sufficient evidence that Dr. Flynn's failure to properly diagnose Mr. Schenck's condition proximately caused Mr. Schenck's injuries. We are of the opinion that there was sufficient evidence.

The evidence in question was given by Dr. James I. Grossman, testifying as an expert witness for plaintiff. Doctor Grossman was of the opinion that Mr. Schenck had suffered a heart attack which was not properly diagnosed the first time he went to the hospital. He noted that Mr. Schenck was not even given an electrocardiogram at that time. Doctor Grossman was asked, over objection, the following questions on the issue of causation:

> "Q Sir, do you have an opinion based on a reasonable degree of medical certainty and probability as to whether or not the deviations of the standards of practice of Dr. Flynn caused any damage to this patient?
>
> * * * * * *
>
> "A Yes, I did.
>
> "Q And what is your opinion, sir?
>
> * * * * * *
>
> "A My opinion is that the result and effect of the fainting episode that he had and the incomplete care that was given to him in the emergency room resulted in his following mental status.
>
> * * * * * *
>
> "Q What mental status are you referring to?
>
> * * * * * *
>
> "A The mental status would be the confusion, disorientation, apprehension and aggressive behavior and comatose-like state the patient had from the time he entered the emergency room on the second occasion through the remaining time that he was in the nursing homes."

In later testimony, Dr. Grossman also gave the following opinion:

"Q Now, sir, considering the same organic brain syndrome from June 13, 1969 to February 20, 1971, do you have an opinion, sir, based on a reasonable degree of medical certainty and probability was this continuous organic brain syndrome from June 13, 1969 to February 20, 1971 caused by the deviations from standards of care as practiced by Dr. Joseph Flynn on the 13th of June, 1969?

* * * * * *

"A Yes.

* * * * * *

"Q What is your opinion?

* * * * * *

"A My opinion is that the episode that occurred on June 13th was related to the ongoing or following organic brain syndrome, in a sense that the patient had collapsed and was sent out of the emergency room the first time which I consider inadequate medical care and he came back in the confused and unconscious state and remained that way thereafter. There is only one conclusion to come to in my mind with this set of events and that the episode that occurred the second time, coming back, clearly is related to the wholly ongoing episodes thereafter.

* * * * * *

"Q And is that statement being said with a reasonable degree of medical certainty and probability?

"A Yes, it is."

**[9]** Viewing the evidence in the light most favorable to plaintiff and resolving all ambiguities in favor of him, as we must, we are of the opinion that Dr. Grossman's testimony constituted a direct and positive statement of causation. Interpreted in this manner, his testimony was, in essence, that Dr. Flynn's failure to properly diagnose and treat Mr. Schenck's initial heart attack caused his subsequent injuries. From this testimony the jury could reasonably infer that proper diagnosis and treatment would have prevented or lessened the resulting injuries. Since plaintiff presented evidence from which the jury could find that Mr. Schenck's injuries were directly and proximately caused by Dr. Flynn's negligence, we hold that the trial justice erred in directing a verdict in favor of defendants.

In light of this holding, we need not pass upon plaintiff's other arguments that the trial justice committed reversible error by excluding certain expert testimony. However, since these issues will undoubtedly arise again in the course of the future trial, we shall consider their merits.

The plaintiff's first contention is that the trial justice erred in refusing to permit Dr. Grossman, plaintiff's expert, to testify as to whether Roger Williams General Hospital was negligent in failing to equip their emergency rooms with an electrocardiogram machine. The trial justice excluded this testimony on the grounds that Dr. Grossman was not qualified as an expert either in hospital administration or emergency room care, and was not from a similar locality to Providence.

**[10–12]** Whether a witness is qualified to express an expert opinion is a matter which is addressed to the sound discretion of the trial justice, and the exercise of such discretion will not be disturbed by this court on appeal absent a showing of abuse. *Anderson v. Friendship Body & Radiator Works, Inc.*, 112 R.I. 445, 311 A.2d 288 (1973); *Morgan v. Washington Trust Co.*, 105 R.I. 13, 249 A.2d 48 (1969); *Baffoni v. Baffoni*, 77 R.I. 232, 74 A.2d 857 (1950). The medical profession's standard of care has been defined as the exercise of the same degree of care and skill as that which is ordinarily employed by the profession under the same conditions in similar localities. *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972); 61 Am.Jur.2d *Physicians and Surgeons* § 207 (1972). The rule regarding "locality" has been liberalized to permit experts from other localities to testify as to the standard of care, *Cavallaro v. Sharp*, 84 R.I. 67, 121 A.2d 669 (1956), provided such localities are sufficiently "similar."

**[13–15]** It appears from the record that Dr. Grossman went to medical school in Chicago and practiced medicine primarily in New York City. This court has recognized that Providence represents a large metropolitan area whose medical facilities and proximity to Boston, a national medical center, make it a similar locality to a city such as Philadelphia. *Cavallaro v. Sharp, supra.* On this basis, it is apparent that Providence and New York City are similar localities for the purposes of expert medical testimony about the medical profession's standard of care. Further, although Dr. Grossman was a specialist in cardiology and not in hospital administration or emergency room care, that fact might have affected the weight given his testimony concerning the absence of an electrocardiogram from the emergency room, but not his competency to testify. *See Morgan v. Washington Trust Co., supra.* For these reasons we conclude that the trial justice abused her discretion in excluding this testimony.

The plaintiff also contends that the trial justice erred in refusing to permit Dr. Grossman to testify as to Mr. Schenck's psychiatric problems. We agree.

**[16]** In *Lantini v. Daniels,* 104 R.I. 572, 247 A.2d 298 (1968), we held that a physician or surgeon, though not a specialist in the field of psychiatry, was nevertheless competent to testify as an expert regarding mental condition or matters of insanity. His lack of training or experience in the field of psychiatry may affect the weight of his testimony, but not his competency to testify. Consequently, the trial justice abused her discretion in refusing to permit Dr. Grossman to testify regarding Mr. Schenck's psychiatric condition.

The plaintiff's appeal is sustained, the judgment appealed from is reversed and the case is remanded to Superior Court for further proceedings in accordance with this opinion.

ORDER

The motion to delay determination of the petition to reargue is denied.

The petition for reargument is denied without prejudice to the right of the defendants to raise the question concerning the claim against the Estate of Dr. Flynn at the new trial.

**Vernon H. HARDY et al.**

**v.**

**The ZONING BOARD OF REVIEW OF the TOWN OF COVENTRY.**

**No. 76–248–M.P.**

Supreme Court of Rhode Island.

Dec. 19, 1977.

Following prior remand for hearing on merits, 113 R.I. 375, 321 A.2d 289, petition for certiorari was filed to review judgment entered in the Superior Court affirming decision of town zoning board of review dismissing petitioners' appeal from issuance by building inspector of three building permits for campsite. The Supreme Court, Paolino, J., held that: (1) issue of petitioners' standing was not properly before the Supreme Court; (2) where records showed that use of subject premises as seasonable camping ground was a permitted use under town zoning ordinance, that toilet and washing facilities were "accessory" to such camping area, that under health department regulations no camp could be licensed without approved sanitary facilities, and that health department had inspected plans for sanitary facilities and approved them before issuance of building permits for erection of two restroom facilities and one combination restroom and office facility for campsite, building inspector had no choice but to issue permit and, that being case, it appeared facially evident that record contained legally competent evidence to warrant the Supreme Court's affirmance, and