**Winifred WILKINSON**
**v.**
**John M. VESEY.**

**Carol PEZZULLO, Administratrix of the Estate of Allen W. Wilkinson**
**v.**
**John M. VESEY.**

**Winifred WILKINSON**
**v.**
**Russel R. HUNT.**

**Carol PEZZULLO, Administratrix of the Estate of Allen W. Wilkinson**
**v.**
**Russel R. HUNT.**

**Nos. 1479–Appeal to 1482–Appeal.**

Supreme Court of Rhode Island.

Oct. 20, 1972.

Malpractice action against radiologists by patient who suffered radiation burns. The Superior Court, Providence and Bristol Counties, Lagueux, J., directed a verdict for defendants and plaintiffs appealed. The Supreme Court, Kelleher, J., held that evidence in action against radiologists who, without benefit of biopsy, initiated course of X-ray treatment for plaintiff who had suffered radiation burns was sufficient to submit to jury the question of radiologists' negligence and that plaintiff who claimed that her consent to radiation treatments was not an informed consent and who suffered radiation burns was not required in malpractice action against radiologists to produce expert testimony regarding propriety of radiologists' silence as to hazards of radiation treatment.

Appeal sustained.

**1. Appeal and Error ⚷927(7)**

In reviewing grant of defendants' motion for directed verdict, reviewing court, like trial court, is bound to consider evidence in light most favorable to plaintiff without weighing it or assessing credibility of witnesses, to give plaintiff benefit of all reasonable inferences flowing from evidence, and to leave determination of any inconsistenceis or discrepancies in testimony adduced by plaintiff to jury.

**2. Physicians and Surgeons ⚷15(7)**

"Medical malpractice" may consist in lack of proper skill or care in making a diagnosis as well as in giving treatment.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Physicians and Surgeons ⚷14(3)**

Physician does not guarantee either successful treatment or correct diagnosis.

**4. Physicians and Surgeons ⚷15(7)**

Claim for misdiagnosis can be maintained if proof is offered which shows that physician's diagnosis was incorrect and that it was negligently made.

**5. Physicians and Surgeons ⚷18(8)**

Evidence as to whether physician has used proper skill and diligence in either diagnosing or treating one's ailment must be supplied by experts unless lack of care is so obvious as to be within layman's common knowledge.

**6. Physicians and Surgeons ⚷18(8)**

In medical malpractice case, expert testimony is required not only to show requisite standard of care to be followed in diagnosis and treatment of ailment but also to demonstrate any deviation from that standard.

**7. Physicians and Surgeons ⚷18(8)**

Testimony which related to standard of care to be used by physicians in diagnosing patient's ailment and which was given by defendant-physicians who had specialized in radiology and who had been called as adverse witnesses could be regarded as expert medical testimony insofar as it de-

scribed practice of competent and responsible medical practitioners in particular medical situation in which plaintiff found herself.

**8. Witnesses ⇐276**

Requisite standard of care may be adduced by invoking adverse witness statute. Gen.Laws 1956, § 9-17-14.

**9. Evidence ⇐571(3)**

Testimony by defendant-physicians who had specialized in radiology that they would not recommend X-ray therapy given plaintiff unless they were convinced that she had cancer and that such sentiment was in accord with accepted practice set community standard for diagnostic pattern to be followed by radiologist practicing at time and in locale where plaintiff was treated.

**10. Physicians and Surgeons ⇐15(16)**

Where community standard for radiologist was such that X-ray therapy given plaintiff should not have been given unless radiologists were convinced that plaintiff had cancer, any doubt as to presence of malignancy precluded use of X-ray treatment.

**11. Physicians and Surgeons ⇐18(8)**

Evidence established that defendant-physicians who administered X-ray therapy to plaintiff deviated from standard of care which precluded use of such therapy unless physicians were convinced plaintiff had cancer.

**12. Physicians and Surgeons ⇐15(7)**

If physician, as aid to diagnosis, does not avail himself of all scientific facilities available to him so that he can obtain best factual data on which he can make diagnosis, omission can be considered as evidence of negligence.

**13. Physicians and Surgeons ⇐15(7)**

Even if medical protocol required that plaintiff's family physician recommend that biopsy be taken, radiologists who were to administer X-ray therapy should have at least suggested to family physician that biopsy be performed and failure to do so established that they did not attempt to make full use of available diagnostic tests.

**14. Physicians and Surgeons ⇐18(9)**

Where evidence permitted inference that X-ray beams administered by defendant physicians had destroyed plaintiff's cancer or plaintiff never had cancer, as against motion by radiologist for directed verdict in malpractice action, reasonable inference to be chosen is latter.

**15. Physicians and Surgeons ⇐18(8)**

Evidence in malpractice action against radiologists permitted jury inference that radiologists who administered X-ray therapy after making diagnosis that plaintiff had malignant tumor in right upper mediastinum had been negligent in making diagnosis and that diagnosis may have been erroneous in fact.

**16. Physicians and Surgeons ⇐18(8)**

Where defendant-physician testified as to necessity that X-ray filter be centered in same exact spot every time treatment was given, defendant-physician's testimony using terms "little below," "about" and "approximately" in describing location of filter during treatment administered to plaintiff permitted inference that goal of preciseness was rarely, if ever, attained during course of treating plaintiff who suffered radiation burns.

**17. Physicians and Surgeons ⇐18(9)**

Where defendant-physician testified that double exposure to X-ray therapy should not occur and that record showing plaintiff had received double exposure was typographical error, it was for jury to determine whether such record was in fact typographical error.

**18. Physicians and Surgeons ⇐18(9)**

Evidence in action against radiologists who, without benefit of biopsy, initiated course of X-ray treatment for plaintiff who

had suffered radiation burns was sufficient to submit to jury the question of radiologists' negligence.

**19. Physicians and Surgeons ⟹15(8)**

Doctrine of informed consent imposes duty on doctor which is completely separate and distinct from his responsibility to skillfully diagnose and treat patient's ills.

**20. Assault and Battery ⟹2**

Where lack of informed consent is alleged in malpractice action against physician, battery concept should not be recognized and recovery under battery theory will be allowed only where procedure is completely unauthorized.

**21. Physicians and Surgeons ⟹15(8)**

Where medical procedure is authorized but patient claims failure to disclose risks involved, claim sounds in negligence.

**22. Physicians and Surgeons ⟹18(8)**

Plaintiff who claimed that her consent to radiation treatments was not an informed consent and who suffered radiation burns was not required in malpractice action against radiologists to produce expert testimony regarding propriety of radiologists' silence as to hazards of radiation treatment. Gen.Laws 1956, § 9–17–19.

**23. Physicians and Surgeons ⟹18(8)**

Requirement that patient obtain expert to evaluate physician's disclosures made in light of prevailing practice in locality undermines very basis of informed consent theory.

**24. Physicians and Surgeons ⟹15(8)**

Patient's right to make up his mind whether to undergo treatment should not be delegated to local medical group and what is reasonable disclosure in one instance may not be reasonable in another.

**25. Physicians and Surgeons ⟹18(6)**

Patient who brings malpractice action against physician and who claims that his consent to treatment was not an informed consent must present evidence as to undisclosed facts and their materiality.

**26. Physicians and Surgeons ⟹18(7, 8)**

Absolving patient bringing malpractice action of need to present medical testimony reflecting community standard of disclosure does not prevent physician from introducing evidence of such standard, if one exists, nor does it eliminate need for witness with proper expertise whose testimony will establish known risks involved in procedure in controversy.

**27. Physicians and Surgeons ⟹16**

Radiologist who administered X-ray treatment could not shift responsibility for disclosing risks of treatment to thoracic surgeon who made original diagnosis of possible cancer or patient's family physician.

**28. Physicians and Surgeons ⟹15(8)**

Physician is not required to disclose risks that are likely to be known by average patient or that are in fact known to patient because of past experience with procedure in question.

**29. Physicians and Surgeons ⟹15(8)**

Physician is not required to tell patient any and all of possible risks and dangers of proposed procedure but is required to disclose all known material risks peculiar to proposed procedure.

**30. Physicians and Surgeons ⟹15(8)**

"Materiality" of risk may be said to be the significance a reasonable person, in what physician knows or should know is patient's position, would attach to disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment.

See publication Words and Phrases for other judicial constructions and definitions.

**31. Physicians and Surgeons ⚷14(1)**

Among factors which point to dangers of medical technique are severity of risk and likelihood of its occurrence.

**32. Physicians and Surgeons ⚷15(8)**

Very small chance of death or serious disablement and potential disability which dramatically outweighs potential benefit of therapy or detriments of existing malady may require appropriate discussions by physician with patient.

**33. Physicians and Surgeons ⚷15(8)**

Physician's liability based on failure to disclose risks is to be judged on basis of what he told patient before treatment began.

**34. Physicians and Surgeons ⚷15(8)**

Liability for failure to disclose risks involved in treatment should be imposed on physician only if trier of fact finds physician's communication to be unreasonably inadequate.

**35. Physicians and Surgeons ⚷15(8)**

Imposition of duty on physician of making disclosure is tempered by recognition that there may be situation where disclosure should not be made because it would unduly agitate or undermine unstable patient.

**36. Physicians and Surgeons ⚷18(6)**

In order to prevail in malpractice action, where recovery is based on doctrine of informed consent, patient must prove that if he had been informed of material risks, he would not have consented to procedure and that he had been injured as result of submitting to procedure.

**37. Physicians and Surgeons ⚷18(4)**

Trial court did not err in refusing to permit patient bringing malpractice action against physicians to amend complaint to allege charge of battery based on failure of physicians to disclose risks to patient.

**38. Physicians and Surgeons ⚷18(6)**

Generally, res ipsa is not applied in medical malpractice actions.

**39. Physicians and Surgeons ⚷18(6)**

Res ipsa may be employed in medical malpractice case when alleged neglect relates to conduct which lies within pale of layman's common knowledge.

**40. Physicians and Surgeons ⚷18(6)**

If determination of physician's negligence does not fall within ken of jury's practical common sense, res ipsa can be called on if there is expert testimony that injury complained of would not have occurred had physician exercised due care.

**41. Physicians and Surgeons ⚷18(6)**

Where patient who suffered radiation burns and who brought malpractice action against radiologists sought to amend complaint to allege doctrine of res ipsa loquitur, requiring patient to prove that X-ray treatment was harmless instrumentality was improper.

**42. Physicians and Surgeons ⚷18(8)**

For purposes of malpractice action by patient who suffered radiation burns against radiologist, radiologist's testimony that had treatment been given as prescribed, patient would not have been harmed permitted inference that patient's injuries would not have occurred if due precautions had been taken.

**43. Physicians and Surgeons ⚷18(6)**

Record in action by patient, who suffered radiation burns, against radiologist established that doctrine of res ipsa loquitur was applicable.

**44. Negligence ⚷121(2)**

In Rhode Island, application of res ipsa establishes prima facie evidence of negligence.

**45. Negligence ⚷121(2)**

Plaintiff who pleads specific acts of negligence will no longer be precluded

from benefit of res ipsa. Rules of Civil Procedure, rule 8(e)(2).

**46. Pleading ⚜245(4)**

Where there was no suggestion that physicians would have been prejudiced by addition of res ipsa count to malpractice complaint because of lateness of motion to amend which was not made until close of patient's case, denial of motion was error.

---

Tobin, Decof, LeRoy & Silverstein, Leonard Decof, Providence, for plaintiffs.

Gunning, LaFazia, Gnys & Selya, Edward L. Gnys, Jr., Providence, for defendants.

OPINION

KELLEHER, Justice.

These are medical malpractice actions brought by a husband and wife against the defendant physicians each of whom has specialized in the field of diagnostic and therapeutic radiology. The wife is the victim of the alleged malpractice. The husband [1] has sued for consequential damages. A jury trial was held in the Superior Court. At the end of eight days of testimony, the plaintiffs concluded their case. At that juncture, the trial justice first refused them permission to amend their complaints and then granted the defendants' motion for a directed verdict. The plaintiffs seek a reversal of each of these adverse decisions. Since we believe the success of the husband's suit is dependent on the defendants' liability to his wife, we shall hereafter treat her as the sole plaintiff. Sometimes during this opinion, we shall refer to the plaintiff as Mrs. Wilkinson or by her first name.

As we begin our consideration of plaintiff's appeal, we shall give a brief summary of the circumstances and incidents which culminated with the commencement of this litigation.

In June, 1951, Winifred Wilkinson was 33 years old, in very "good" health, married and the mother of two children. During the early summer, she began to experience radiating pains in her hands, arms and legs. She brought her complaints to the Wilkinsons' family physician, Dr. Eugene Gaudet. He advised plaintiff to enter the Roger Williams General Hospital for a period of observation. Winifred spent a week at the hospital. She received no treatment but, as part of the hospital's routine, had an x-ray taken of her chest.

Sometime after her departure from the hospital, Winifred was notified by Dr. Gaudet that the hospital x-ray showed a "shadow."

Winifred returned to the hospital. She remained there for 10 days. During this interval, she met defendants. They were members of the hospital staff and associated in the practice of their specialty. Their office was located on the hospital's premises. Doctor Peter Harrington,[2] a

1. These suits were begun in April, 1962. During their pendency, several significant events have occurred. The husband, Allen W. Wilkinson, died and his administratrix has been substituted as a plaintiff. The defendant, Dr. Hunt, has retired from practice. The suits were commenced at a time when common law pleadings governed practice in the Superior Court. Each file is replete with declarations, amended declarations, pleas in abatement, demurrers and replications. Trial was held during September, 1969, at a time when the new Rules of Civil Procedure were applicable. We have, therefore, used the terminology of the new rules.

2. The plaintiff has also sued Dr. Harrington. In Wilkinson v. Harrington, 104 R.I. 224, 243 A.2d 745 (1968), all three physicians contended that Winifred's suits were barred by the statute of limitations. There, we held that the statute did not begin to run until the patient discovered, or in the exercise of due care should have discovered, that she was a victim of the physicians' negligent conduct. The plaintiff's motion to consolidate all three cases for trial was denied by a justice of the Superior Court. The plaintiff then filed a motion for leave to file a petition for certiorari asking us to review this ruling. We denied her motion.

"chest specialist" was summoned in as a consultant. A chest x-ray taken on July 28 and a fluroscope examination conducted on July 30 were interpreted by the two radiologists. A report dated July 30 and signed by Dr. Hunt, but embodying both defendants' conclusions, states that Winifred had "probably a lymphoma of the mediastinum [3] or possibly a substernal thyroid."

The defendants recommended that Winifred undergo a "trial" course [4] of deep radiation therapy which began on July 30 and continued each day until August 4. An x-ray taken on August 10 disclosed a shrinkage in the shadow. The defendants viewed this x-ray and diagnosed Winifred's ailment as a malignant tumor in the right upper mediastinum. The therapy treatments continued. They were administered on three different periods of time during an interval which began on August 13 and ended sometime in January, 1952. Each period of treatment extended over a period of several days. During this time, the x-rays were administered sometimes on the chest and other times on Winifred's back. Three different parts of the chest and the back were exposed to the radiation beam. The plaintiff would report to either defendant, both before and after the treatment.

In 1955, Winifred began to notice a discoloration in her chest area. The color went from pink to purple. The skin broke down. Medication proved useless. The back area began to deteriorate. Doctor Harrington informed Winifred that her skin problem was caused by the 1951–52 radiation treatments. The plaintiff was told to seek the aid of plastic surgery. She was first operated on in June, 1960.

At trial time, Winifred's medical-surgical box score listed eight operations, numerous skin grafts, the removal of seven ribs, the clavicle and the sternum. Her heart has been moved and is cushioned and supported by muscle taken from the left arm. She has had innumerable and lengthy hospitalizations. Testimony was adduced which showed that the condition which caused Winifred to seek the assistance of the plastic surgery was radiation burns which were attributable to the 1951–52 treatments.

In our consideration of plaintiff's appeal, we shall initially discuss the granting of the directed verdict and then go on to the denial of the motion to amend the complaints.

### The Directed Verdict

The plaintiff bases her right to proceed against defendants on three different grounds. She charges defendants with negligence in that (1) they incorrectly diagnosed her ailment; (2) the x-ray therapy was improperly administered; and (3) they failed to obtain her knowing consent to the treatment given her.

[1] Since we are reviewing the grant of defendants' motion for a directed verdict, this court, like the trial court, is bound to consider the evidence in a light most favorable to plaintiff without weighing it or assessing the credibility of the witnesses, to give plaintiff the benefit of all reasonable inferences flowing from the evidence, and to leave the determination of any inconsistencies or discrepancies in the testimony adduced by plaintiff to the jury. Lamont v. Central Real Estate Co., R. I., 294 A.2d 195 (1972). When we consider each of plaintiff's theories of recovery in the light of these principles, we are obliged to reverse the granting of the directed verdict.

3. The mediastinum is that space laying within the chest. It is bounded on each side by the lung cavities. Within the mediastinum are found the heart, esophagus, the aorta and vena cava.

4. This period between July 30 and August 4 was described as a "trial" course. Its purpose was to further establish the earlier diagnosis but it is undisputed that the procedures used are almost identical to those followed in the subsequent therapy sessions.

The Diagnosis

[2-4] Medical malpractice may consist in the lack of proper skill or care in making a diagnosis as well as in giving treatment. A physician, of course, does not guarantee either a successful treatment or a correct diagnosis. Nevertheless, a claim for a misdiagnosis can be maintained if proof is offered which shows that the diagnosis was incorrect and that it was negligently made. O'Brien v. Stover, 443 F.2d 1013 (8th Cir. 1971); Sinkey v. Surgical Associates, Iowa, 186 N.W.2d 658 (1971); Hollis v. Ferguson, 244 Or. 415, 417 P.2d 989 (1966).

[5] Evidence as to whether a physician has used proper skill and diligence in either diagnosing or treating one's ailment must be supplied by experts unless the lack of care is so obvious as to be within the layman's common knowledge. Nolan v. Kechijian, 75 R.I. 165, 64 A.2d 866 (1949); Coleman v. McCarthy, 53 R.I. 266, 165 A. 900 (1933); Bigney v. Fisher, 26 R.I. 402, 59 A. 72 (1904); Barker v. Lane, 23 R.I. 224, 49 A. 963 (1901). The physician's standard of care has been defined as the employment of the same degree of diligence and skill which is commonly possessed by other members of the profession who are engaged in the same type of practice in similar localities[5] having due regard for the state of scientific knowledge at the time of treatment. Bigney v. Fisher, *supra.*

[6] Initially, we believe that expert testimony was required not only to show the requisite standard of care to be followed in the diagnosis and treatment of Winifred's ailment, but also to demonstrate any deviation from that standard. The trial justice, in granting defendants' motion for a direction, made much of plaintiff's failure to produce this type of testimony.

[7, 8] Apparently, the trial justice overlooked the fact that plaintiff called both defendants as adverse witnesses. Each defendant is an expert in his specialty. Doctor Hunt testified that he had spent some thirty-odd years practicing his specialty in Rhode Island. Doctor Vesey spoke of the three years he spent preparing for his specialty. Their testimony can certainly be regarded as expert medical testimony insofar as it described the practice of competent and responsible medical practitioners in the particular medical situation in which Winifred found herself. Console v. Nickou, 156 Conn. 268, 240 A.2d 895 (1968); McDermott v. Manhattan Eye, Ear & Throat Hospital, 15 N.Y.2d 20, 255 N.Y.S.2d 65, 203 N.E.2d 469 (1964); Nishi v. Hartwell, 52 Hawaii 188, 473 P.2d 116 (1970); Chasco v. Providence Memorial Hospital, 476 S.W.2d 385 (Tex.Civ.App. 1972). The requisite standard of care may be adduced by invoking our adverse witness statute. General Laws 1956 (1969 Reenactment) § 9-17-14.

[9-11] Both defendants testified that they would not recommend the x-ray therapy given Winifred unless they were "convinced" that she had cancer. Doctor Vesey said that this sentiment was in accord with the accepted practice in his profession in 1951. We believe that this testimony set the community standard for the diagnostic

5. Today, many courts look upon the locality requirement as an anachronism. Modern systems of transportation and communication, plus a proliferation of literature, seminars and post-graduate courses, make it possible for all practitioners to be reasonably familiar with current medical advances. Consequently, a growing number of jurisdictions permit medical witnesses, from localities other than that in which the defendant practices, to testify as to the standard of care that the defendant should have observed. Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793 (1968); Douglas v. Bussabarger, 73 Wash.2d 476, 438 P.2d 829 (1968). *See also* Gridley v. Johnson, 476 S.W.2d 475 (Mo.1972). In Cavallaro v. Sharp, 84 R.I. 67, 121 A.2d 669 (1956), we said that an otologist whose prior professional experience had been gained in Philadelphia could testify as to the care and skill exercised by a Rhode Island otologist.

pattern to be followed by a radiologist practicing his art in Rhode Island some twenty years ago. Accordingly, if there was any doubt as to the presence of a malignancy in Winifred's mediastinal area, x-ray treatment should not have been pursued. There is evidence in the record which shows a deviation by defendants from the standard they described.

There is a report dated August 10, 1951, which bears the signature of Dr. Harrington. Incidentally, August 10 was three days prior to the commencement of the three periods of deep radiation treatment. In it is found the following pertinent notation:

> "[I]t is important to obtain the miniature preemployment film from State Health Department. This was taken two years ago. If the mass is a recent development x-ray therapy should be completed; otherwise, we should re-evaluate case."

Doctor Vesey could not remember if he looked at the film. He conceded that the radiologists' record has no entry which shows that the Health Department was contacted and the film examined. Doctor Vesey conceded that if he had seen this film, it would have assured him of the length of time the tumor had been present in Winifred's chest. We think Dr. Vesey's testimony is subject to the inference that this earlier x-ray picture was not obtained and thereby defendants proceeded in complete disregard of Dr. Harrington's admonition.

There is a report filed by Dr. Hunt and also dated August 10 which describes a mass located in the upper right mediastinum as "probably a lymphoma." Probability is certainly something less than positive. It indicates an uncertainty as to the diagnosis.

Doctor Hunt conceded that in 1951 a biopsy was a recognized diagnostic procedure. The plastic surgeons and the pathologist who testified for Mrs. Wilkinson made it quite clear that a biopsy supplies conclusive proof of whether or not a tumor is or is not malignant. Doctor Hunt, when asked about the absence of a biopsy, stated that it was Dr. Gaudet's, not his, responsibility to recommend this procedure. However, the senior radiologist testified that Mrs. Wilkinson had been referred to him and his associate as a private patient. Mrs. Wilkinson testified that she looked upon defendants as her "attending" physicians in x-ray.

[12, 13] If a physician, as an aid to diagnosis, does not avail himself of all of the scientific means and facilities available to him so that he can obtain the best factual data upon which he can make a diagnosis, such an omission can be considered as evidence of negligence. Clark v. United States, 402 F.2d 950 (4th Cir. 1968). Even assuming that medical protocol required that Dr. Gaudet recommend to Winifred that a biopsy be taken, the least that defendants should have done was to suggest to the family physician that a biopsy be performed. Their failure to do so shows that they did not attempt to make full use of the available diagnostic tests so that they could be convinced of the presence of a malignancy before they commenced the therapy.

There is evidence in the record which warrants an inference that defendants' diagnosis was wrong. Although Dr. Hunt testified that, when he last saw Winifred in November, 1952, he felt that her tumor was still cancerous, the plastic surgeons and a pathologist declared they found no indication of a malignancy in any of the tissues and bones removed from Winifred's chest. Biopsies of this material showed no cancer. In addition, Mrs. Wilkinson testified that in 1960 Dr. Harrington told her that she never had cancer. While the trial justice in his decision observed that this particular statement relative to Dr. Harrington had been admitted solely as it related to the issue of whether Mrs. Wilkinson should have been aware of the com-

mencement of the two-year statute of limitations, there is no such restriction in the record. This statement could have been used by the jury in finding an incorrect diagnosis.

[14, 15] It is clear, therefore, on the state of the record that two inferences may be drawn from this testimony. Either the x-ray beams had destroyed the cancer or Winifred never had cancer. The posit of the case being what it is, the reasonable inference to be chosen is the latter. There was evidence from which a jury could infer that the diagnosis was negligently made and erroneous in fact.

## The Treatment

Here, as in the diagnostic phase of this appeal, there was expert testimony as to the standard of treatment to be supplied by a specialist in therapeutic radiology. Both defendants emphasized that the one thing to be avoided at all costs was an overlapping of the different fields of exposure. As noted earlier, there were three areas on Winifred's chest which were exposed to x-ray beams. They were the right upper mediastinum, the hilar of the left lung and the upper left lung. When treatments were administered, plaintiff would lie on a table. The tube of the x-ray machine would be lowered so that the x-ray filter which had been attached to the tube would rest on plaintiff's body. The treatment was given by defendants. They gave it on alternative days. One day it was Dr. Hunt's turn and the next day it was Dr. Vesey who placed the cone. Some days, the patient's back would be exposed to the x-ray beams. The portions of the back which were exposed were supposed to be directly opposite the chest area that had been exposed the previous day.

The defendants explained that in order to insure no overlap, it was essential that the filter be centered exactly in the middle of the field of exposure every time the treatment was given. Doctor Hunt explained that they employed no anatomical diagram to mark the areas of the body that were to be exposed to the radiation. He said that he did not know if anatomical diagrams were employed by other radiologists. Instead, the doctor having the day's duty would lower the filter to a spot marked by his finger. He would remove the finger and lower the filter to the point where the finger had pointed. He conceded that when the filter was lowered to the body, it was impossible to tell if it was precisely in the center of the field. The senior associate said that he never made any mark on Winifred's body which could have served as a target for the outside edge of the filter.

Two different filters were used in the course of the treatment. One was round, 15 centimeters in diameter. The other was square, 15 centimeters on a side. Naturally, the square filter covered a larger area than its circular counterpart. Fifteen centimeters measures just a speck shy of six inches.

Doctor Hunt was somewhat imprecise as he described defendants' technique of centering the filter. He said that when treating the upper right mediastinal area, the filter was centered "about five to eight centimeters" to the right of the midline of the body. This specialist stated that when it was time to radiate the hilar of the left lung, the filter was centered a "little below" the left nipple and from six to seven centimeters to the left of the midline. Finally, when the filter was positioned for treatment to the left upper lung, it was placed "approximately" five to six centimeters below the center of the clavicle.

[16] We think it is obvious that the witness' use of such inexact terms as a "little below," "about," and "approximately" are completely at odds with his standard that the filter be centered in the same exact spot every time treatment was given. Given the one-day on, one-day off practice of defendants, their imprecise measurements, and the ulcerated chest conditions

suffered by Winifred, it is reasonable to infer that the goal of preciseness described by Dr. Hunt was rarely, if ever, attained.

[17] Furthermore, Dr. Vesey acknowledged that records showing the daily schedule of treatments given Winifred revealed a double exposure, an incident which he acknowledged should be avoided. The doctor attributed this particular series of entries to a typographical error. Whether it was typographical or not was a matter for the jury's determination.

[18] The issue of defendants' negligent treatment should have been submitted to the jury.

### The Failure to Disclose the Possible Risks Involved in the Treatment Prescribed

One-half century ago, Justice Cardozo, in the oft-cited case of Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92 (1914), made the following observation:

> "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault, for which he is liable in damages. (cites omitted) This is true except in cases of emergency where the patient is unconscious and where it is necessary to operate before consent can be obtained." *Id.* at 129–130, 105 N.E. at 93.

We adhered to this principle in Nolan v. Kechijian, *supra*, where we said a surgeon could be liable in an action of trespass for the unauthorized removal of a patient's spleen where the evidence showed that the consent given was limited to surgery which was designed to strengthen the ligaments supporting the spleen.

[19] Shortly after the *Schloendorff* case, there began to appear on the judicial scene a doctrine wherein courts[6] with increasing frequency began to rule that a patient's consent to a proposed course of treatment was valid only to the extent he had been informed by the physician as to what was to be done, the risk involved and the alternatives to the contemplated treatment. This theory, which today is known as the doctrine of informed consent,[7] imposes a duty upon a doctor which is completely separate and distinct from his responsibility to skillfully diagnose and treat the patient's ills.

The trial justice recognized the concept of informed consent but ruled it was inapplicable to the case at bar.

[20, 21] There is no unanimity as to the theory of recovery which a plaintiff must adopt when his suit alleges a failure by a physician to adequately disclose the risks and alternatives of a proposed diagnostic,

6. Among the first cases were Theodore v. Ellis, 141 La. 709, 75 So. 655 (1917); Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360 (1918). The *Hunter* case involved the use of x-ray treatment to cure the patient's eczema. The Virginia court found that there was sufficient evidence to rest the jury's verdict on the ground of negligent treatment but went on to discuss the physician's failure to disclose the risks of x-ray therapy.

7. The development of this doctrine has caused a flood of legal commentary. Some of the more informative views expressed can be found in Johnson, Medical Malpractice—Doctrines of Res Ipsa Loquitur and Informed Consent, 37 U.Colo.L.Rev. 169 (1965); McCoid, The Care Required of Medical Practitioners, 12 Vand.L.Rev. 549 (1959); Plante, An Analysis of "Informed Consent," 36 Ford.L.Rev. 639 (1968); Waltz and Scheuneman, Informed Consent to Therapy, 64 Nw.U.L. Rev. 628 (1970); Comment, Informed Consent in Medical Malpractice, 55 Cal. L.Rev. 1396 (1967); Restructuring Informed Consent: Legal Therapy For the Doctor-Patient Relationship, 79 Yale L.J. 1533 (1970); Failure to Inform as Medical Malpractice, 23 Vand.L.Rev. 754 (1970); Comment, Informed Consent as a Theory of Medical Liability, 3 Wis.L.Rev. 879 (1970).

therapeutic or surgical procedure. Some courts have held that any treatment or procedure given without informing the patient of its inherent risks vitiates the consent and allows suit based upon the theory that a battery has been committed. Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958); Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966). The prevailing view, however, classifies the physician's duty in this regard as a question of negligence because of the absence of the elements of any wilful intent by the physician to injure his patient. Mallett v. Pirkey, 171 Colo. 271, 466 P.2d 466 (1970); Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093 (1960), rehearing denied, 187 Kan. 186, 354 P.2d 670 (1960); Wilson v. Scott, 412 S.W.2d 299 (Tex.1967); Watson v. Clutts, 262 N.C. 153, 136 S.E.2d 617 (1964). We think that where the lack of informed consent is alleged, the battery concept should not be recognized. Recovery under the battery theory will be allowed only where the procedure is completely unauthorized. Where, as here, the procedure is authorized but the patient claims a failure to disclose the risks involved to a course of therapy, the claim sounds in negligence. Fraser & Chadsey, Informed Consent in Malpractice Cases, 6 Willamette L.J. 183 (1970).

Likewise, there is a divergence of opinion as to the necessity for and the use of expert testimony in determining the scope of the physician's duty to warn or inform his patient of the risks inherent in any proposed course of therapy or surgery. Most jurisdictions[8] treat informed consent in the same manner as medical malpractice. As a result, plaintiff is required to establish (1) by expert medical testimony what a reasonable practitioner, under the same or similar circumstances, would have disclosed to his patient concerning risks incident to a proposed procedure; and (2) that the physician has deviated from this standard to the injury of the plaintiff. Proof of these two elements is required in instances where there has been a partial disclosure as well as in instances of no disclosure. The trial justice, in granting a direction on the informed consent count, pointed to the lack of expert testimony.

The plaintiff recognizes the majority view but asks that we adopt a modified version of the majority view as expressed in Natanson v. Kline, *supra*.

In that case, the plaintiff brought suit to recover damages which she allegedly suffered as the result of her receiving radiation therapy using radioactive cobalt. One of the grounds for her charges of negligence was the defendant's failure to warn the plaintiff that the proposed course of treatment involved grave consequences, including the risk of bodily injury or even death.

As explicated in Collins v. Meeker, 198 Kan. 390, 424 P.2d 488 (1967), the *Natanson* rule provides that, in absence of an emergency, a physician has an obligation to make a reasonable explanation and disclosure to his patient of the risks and hazards involved in a proposed course of treatment to the end that whatever consent given by the patient to the prescribed treatment may be an informed and intelligent consent; that where a physician is silent and makes no disclosure whatever, he has failed in the duty owed to the patient and the patient is not required to produce expert testimony to show that the doctor's failure was contrary to accepted medical practice but rather that it devolves upon the doctor to establish that his failure to make any disclosure did in fact conform under the existing conditions to accepted medical standards; and that where actual disclosures have been made and are ascertainable, the patient then must produce ex-

8. Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74 (1965); Di Filippo v. Preston, 53 Del. 539, 173 A.2d 333 (1961); Nishi v. Hartwell, 52 Haw. 188, 473 P.2d 116 (1970); Grosjean v. Spencer, 258 Iowa 685, 140 N.W.2d 139 (1966); Roberts v. Young, 369 Mich. 133, 119 N.W.2d 627 (1963); Govin v. Hunter, 374 P.2d 421 (Wyo.1962).

pert medical testimony to establish that the disclosures made were not in accord with those which reasonable medical practitioners would have divulged under the same or like circumstances.

While there may be strength in numbers as one views the many courts which require expert testimony as to the community standard of revelation by one seeking to recover on the basis of informed consent, this view has come under increasing criticism.[9]

It has been pointed out that it is much more difficult to establish a community standard in the area of disclosure of risks than when speaking of diagnosis or treatment. Each patient-physician relationship may present facts which are unknown to other physicians. The amount of disclosure can vary from one patient to another. The situations presented require a degree of subjectivity which inhibits the expert from utilizing the required objectivity of judgment. Informed Consent in Medical Malpractice, 55 Cal.L.Rev. 1396 (1967). One court has observed that the majority view relegates the patient's right to make an informed election to a position of secondary importance because it measures that right entirely in terms of standards adopted by those whose obligation is to inform. Mason v. Ellsworth, 3 Wash.App. 298, 474 P.2d 909 (1970). Another court took into consideration the patient's difficulty in finding a physician who would breach the "community of silence" by testifying against the interest of one of his professional colleagues. Cooper v. Roberts, 220 Pa.Super. 260, 286 A.2d 647 (1971). In speaking of the reluctance of one professional to testify against another, we are aware that in Coleman v. McCarthy, 53 R.I. 266, 165 A. 900 (1923), this court thought this difficulty was more apparent than real because of the Superior Court's statutory power to appoint expert witnesses who may subsequently testify at trial. General Laws 1956 (1969 Reenactment) § 9-17-19. This observation was made in a day when malpractice suits were a rarity. Today, we think it is obvious that while the court can appoint an expert, there is no compulsion on the part of the appointee to serve, particularly if he thinks his court appearance may jeopardize the renewal of his malpractice insurance or result in an increase in the premium paid by his colleagues.

The most cogent reasoning as to the weakness of the majority view can be found in the 1968 supplement to 2 Harper & James, The Law of Torts (1956) at 60-61. There, Professor James points out that, in the usual malpractice case, the doctor and the patient have a common goal. Each desires a cure if it can be had. However, no such assumption can be made when considering the issue of informed consent. The keystone of this doctrine is every competent adult's right to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks however unwise his sense of values may be in the eyes of the medical profession, or even the community.

[22] Since the patient's right to make his decision in the light of his own individual value judgment is the very essence of his freedom of choice, this distinguished scholar contends that it should not be left entirely to the medical profession to determine what the patient should be told. He emphasizes, and we agree, that the *Natanson* rule is designed to safeguard an individual's freedom of choice because it requires the physician to disclose to his patient the risks attendant upon a proposed course of treatment unless the doctor

9. One alternative solution to the problems found in this area is offered in 2 Louisell & Williams, Medical Malpractice § 22.08 (1971). It provides that a physician is under an obligation (1) to make a full disclosure of all known material risks in a proposed operation or course of treatment, except for those risks of which a patient is likely to know; or (2) to prove the reasonableness of any less disclosure or the immateriality of the undisclosed risk.

makes an affirmative showing that nondisclosure was in the best interests of the patient. Accordingly, the trial justice erred in requiring Winifred to produce expert testimony regarding the propriety of defendants' silence as to the hazards of the radiation treatment.

Because of the necessity for a retrial, our doubt as to what may develop at the second trial and a genuine desire on our part that this litigation proceed to an expeditious and final determination, we shall express our views concerning the patient's obligation to produce expert evidence as to the amount of information a doctor in a particular locality should convey to his patient. We shall go one step beyond *Natanson* and join hands with Canterbury v. Spence, 464 F.2d 772 (D.C. Cir. 1972), where the Circuit Court of Appeals ruled that there was no necessity for expert testimony since the jury could determine, without recourse to a showing by the plaintiff of what the medical fraternity in the community tells its patients, the reasonableness or unreasonableness of the extent of a physician's communication with a patient. Our reasoning, however, may be somewhat different than that of the court in *Canterbury*.

[23, 24] The requirement that a patient obtain an expert to evaluate the disclosures made in the light of the prevailing practice in the locality undermines the very basis of the informed consent theory—the patient's right to be the final judge to do with his body as he wills. Blind adherence to local practice is completely at odds with the undisputed right of the patient to receive information which will enable him to make a choice—either to take his chances with the treatment or operation recommended by the doctor or to risk living without it. As will be noted later, the patient is entitled to receive material information upon which he can base an informed consent. The decision as to what is or is not material is a human judgment, in our opinion, which does not necessarily require the assistance of the medical profession. The patient's right to make up his mind should not be delegated to a local medical group—many of whom have no idea as to his informational needs. The doctor-patient relationship is a one-on-one affair. What is a reasonable disclosure in one instance may not be reasonable in another. This variability negates the need of the plaintiff showing what other doctors may tell other patients.

[25] The jury can decide if the doctor has disclosed enough information to enable the patient to make an intelligent choice without the necessity of the plaintiff's expert. The plaintiff, of course, must present evidence as to the undisclosed facts and their materiality. If the jury finds the undisclosed information immaterial, the doctor has acted reasonably in withholding it. If it finds the nondisclosure is material, the doctor may have acted unreasonably and will be held liable for his failure to obtain the patient's informed consent.

[26] By our absolving the patient of the need to present medical testimony reflecting a community standard of disclosure, we do not mean to prevent the physician from introducing evidence of such a standard, if one exists, nor does it eliminate the need for a witness with the proper expertise whose testimony will establish the known risks involved in the procedure in controversy. Mason v. Ellsworth, *supra*.

In stressing the patient's right to make a choice, we are aware that a patient may hear solely what he wants to hear, or be completely inattentive to what he is being told or after an adverse result forget what he was told. Such matters are issues of credibility to be resolved by the trier of fact. Mason v. Ellsworth, *supra*. We have every confidence that a juror will adhere to his oath and "give a true verdict * * * according to law and the evidence given you."

[27] In further commenting on this phase of plaintiff's claim, the trial justice

remarked that defendants had a secondary role in the treatment given Winifred. He placed the duty to disclose upon the shoulders of either Dr. Harrington, whom he described as a thoracic surgeon, or Dr. Gaudet. We disagree.

Initially, we find nothing in the record which shows that Dr. Harrington is in fact a surgeon. Secondly, the fact pattern here is on all fours with that of *Natanson*. The Kansas court found that the radiologist had the duty as a matter of law to disclose even though the plaintiff had been referred to him by another physician. There is ample evidence from which a jury could find that defendant radiologists actively participated in making the diagnosis and prescribing the treatment. The record is replete with evidence susceptible to the inferences that they were in complete charge of the therapy program. In view of this, it is completely unjust and unwarranted to insulate them from the responsibility relating to the disclosure or nondisclosure of the risks inherent in the use of deep radiation therapy and passing this obligation on to the chest specialist or the family physician.

[28–35] Having established defendants' duty to disclose, we will now delineate the extent of the disclosure which should be made. Obviously there is no need to disclose risks that are likely to be known by the average patient or that are in fact known to the patient usually because of a past experience with the procedure in question. Fleishman v. Richardson-Merrell, Inc., 94 N.J.Super. 90, 226 A.2d 843 (1967); Starnes v. Taylor, 272 N.C. 386, 158 S.E.2d 339 (1968). It is not necessary that a physician tell the patient any and all of the possible risks and dangers of a proposed procedure. Getchell v. Mansfield, Or., 489 P.2d 953 (1971).[10] As we noted earlier, materiality is to be the guide. It is our belief that, in due deference to the patient's right to self determination, a physician is bound to disclose all the known material risks peculiar to the proposed procedure. Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his patient's position, would attach to the disclosed risk or risks in deciding whether to submit or not to submit to surgery or treatment. Waltz and Scheuneman, Informed Consent to Therapy, 64 Nw.U.L.Rev. 628, 640 (1970). Among the factors which point to the dangerousness of a medical technique are the severity of the risk and the likelihood of its occurrence. A very small chance of death or serious disablement may well be significant; a potential disability which dramatically outweighs the potential benefit of therapy or the detriments of the existing malady may require appropriate discussions with the patient. Canterbury v. Spence, *supra*.[11] A physician's liability in this area is to be judged on the basis of what he told the patient before treatment began. Liability should be imposed only if the trier of fact finds the physician's communication to be unreasonably inadequate. Canterbury v. Spence, *supra*. The imposition of a duty of making disclosure is tempered by the recognition that there may be a situation where a disclosure should not be made because it would unduly agitate or undermine an unstable patient. Stauffer v. Karabin, Colo.App., 492 P.2d 862 (1971); Di Filippo v. Preston, 53 Del. 539, 173 A.2d 333 (1961); Natanson v. Kline, *supra*.

[36] There was evidence in the record as to the risk involved in a nonnegligent administration of the radiation therapy. When Dr. Hunt was on the witness stand, he was asked whether, if no

10. *Getchell* provides another instance of the move away from requiring the patient to produce expert testimony as to the extent of disclosure made in a particular locality. The Oregon court ruled that if expert testimony has established the existence of a risk that is material, the possible alternatives and the fact that the disclosure would not be detrimental to the patient, there is no need for an expert to describe the prevailing standard of disclosure.

11. In *Canterbury*, a neurosurgeon was held liable for his failure to reveal the risk of paralysis involved in a laminectomy.

deviation had been taken from the procedures he had described, the treatment would have produced the result that it did. His first reply was, "I can't say that." Later, in reply to another question, he said that the treatment as described was "not expected" to produce the result experienced by Winifred. His answers, which are at odds with his later testimony that the treatment, if properly given, would cause no harm, are susceptible to the inference that the damage caused to Winifred's chest area was a known possible risk even if the procedures were followed to the letter. In order to prevail in an action, where recovery is based upon the doctrine of informed consent, the plaintiff must prove that if he had been informed of the material risk, he would not have consented to the procedure and that he had been injured as a result of submitting to the procedure. Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74 (1965). It is obvious from the record [12] that Winifred was prepared to offer evidence that she would have refused to undergo the proposed therapy had she been properly informed.

Since this is the first time that we have considered the doctrine of informed consent, it is fitting that we conclude this phase of the present appeal by quoting the following exhortation found in Morris and Moritz, Doctor and Patient and The Law (5th ed. 1971):

"Accordingly, prudent advice to the doctor would seem to be as follows: All medical procedures have risks (the patient not allergic to penicillin yesterday may be violently so today); the greater the risk, the greater the duty to inform. *Rule of thumb*: unless therapeutic reasons contraindicate, make a simple, quiet, but honest disclosure commensurate with the risk in all cases and let the patient choose what risks he wishes to run with his body. * * *

"Besides being good medicine, good humanity, good public relations, and good medicolegal defense, the preceding advice has a therapeutic value all its own. The informed and consenting patient, aware of the risk, is not so shocked should the risk turn up in his case and, if patient-physician rapport is high, is much less likely to sue his doctor in the first instance."

The text to which we have just referred can be found in the library of the Rhode Island Medical Society. One of its authors is an attorney and the other, Dr. Allen R. Moritz, is a physician who has specialized in pathology. We have cited this work to emphasize the thought shared by many that "more communication" between doctor and patient means "less litigation" between patient and doctor.

There was error in directing the verdict on the issue of the lack of Winifred's informed consent.

Motion to Amend

The final phase of Winifred's appeal brings before us the correctness of the denial of her motion to add two additional counts to her complaint—one for a battery and the other embracing the doctrine of res ipsa loquitur.

[37] The battery issue has been discussed at length earlier when we considered defendants' alleged failure to tell Winifred of the inherent risks of radiation therapy. Recovery, if it is had, is based on a theory of neglect, rather than the wilful act which is implicit in any charge of battery. There was no error in the trial

12. The following is illustrative of the questions which were posed to Winifred by her counsel but which she was unable to answer because of an objection interposed by defendants:

"Q If you had known, Mrs. Wilkinson, or if you had been informed that there was a possibility that this various injuries that you've told us about could have resulted from your taking these x-ray therapy treatments, would you have consented to take them?"

justice's refusal relative to the battery count. The res ipsa count presents a different situation.

[38] As a general rule res ipsa is not applied in medical malpractice actions. Webb v. Jorns, 473 S.W.2d 328 (Tex.Civ.App.1971). This is because medicine is recognized as an inexact science from the practice of which serious complications can arise that cannot, without proof of some negligent act, be charged to the physician. Carpenter v. Campbell, Ind.App., 271 N.E.2d 163 (1971). This is not to say, however, that res ipsa can never be available to the patient who charges a physican with negligent treatment or surgery.

[39, 40] Res ipsa may be employed when the alleged neglect relates to conduct which lies within the pale of a layman's common knowledge. Raza v. Sullivan, 139 U.S.App.D.C. 184, 432 F.2d 617 (D.C. Cir. 1970); Jewish Hospital Ass'n v. Lewis, 442 S.W.2d 299 (Ky.1969); Fehrman v. Smirl, 20 Wis.2d 1, 121 N.W.2d 255, 122 N.W.2d 439 (1963). If the determination of negligence does not fall within the ken of the jury's practical common sense, the doctrine can be called upon if there is expert testimony that the injury complained of would not have occurred had the physician exercised due care. Kerr v. Bock, 5 Cal.3d 321, 95 Cal.Rptr. 788, 486 P.2d 684 (1971); Brannon v. Wood, 251 Or. 349, 444 P.2d 558 (1968); *see also,* Malpractice-Res Ipsa Loquitur, 82 A.L.R.2d 1262 (1962); Injury by X-ray, 41 A.L.R.2d 329 § 8 at 355 (1955); Res Ipsa Loquitur, A Case For Flexibility in Medical Malpractice, 16 Wayne L.Rev. 1136 (1970).

The trial justice's denial of the use of res ipsa was based on his belief that the instrumentality causing the injury had to be "innocuous" and his observation that plaintiff's motion came too late in the proceedings. We disagree.

In referring to the quality of innocuousness, the trial justice cited Kilgore v. Shepard Co., 52 R.I. 151, 158 A. 720 (1932) and went on to say that an x-ray therapy machine could not be so classified because its very function was to generate and project a beam which was designed to destroy diseased blood cells and tissues. We have examined *Kilgore* and find that in essence it sets forth the three "traditional" conditions which, as Prosser points out, first appeared in the first edition of Wigmore, Evidence.[13] They are as follows: (1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary act or contribution on the part of the plaintiff.

[41] We think the trial justice overburdened plaintiff in requiring proof of a harmless instrumentality. His insistence apparently stems from the case of Douglas v. First National Stores, Inc., 54 R.I. 278, 172 A. 723 (1934). *Douglas* sought recovery for damages he sustained from an exploding soda bottle. *Douglas* specifically disclaimed any reliance on res ipsa but alleged a negligent overcharge of the carbonated beverage. In holding that there was sufficient evidence to require submission of *Douglas'* case to the jury, the court said that it was common knowledge that soda water, *when properly bottled,* is harmless. The *Douglas* case was cited in Cinq-Mars v. Kelley, 95 R.I. 515, 188 A.2d 379 (1963), where the plaintiff did rely on res ipsa to recover for injuries he suffered when a crane cable used to lift large looms snapped causing the loom to fall. *Cinq-Mars,* as did *Douglas,* argued that the dependability of the cable, absent some negligence, was a matter of common knowledge. When the court spoke of the harmless nature of soda and the crane cable, it was saying no more than that it was com-

13. 4 Wigmore, Evidence § 2509 at 3557 (1st ed. 1905); *See,* Prosser, Torts § 39 at 214 (4th ed. 1971).

mon knowledge that the episode which occurred usually did not occur in the absence of someone's negligence.

We, of course, cannot use the common knowledge route to establish that Winifred's injuries would not have occurred unless defendants were negligent. X-ray therapy stands in a much different light than an incident in surgery where a drain was left in an incision and remained there after the wound had healed. While the record is sketchy, this court in Evans v. Munro, 83 A. 82 (1912), appears to have had res ipsa in mind when it stated that the surgeon had the burden of showing that the drain's presence was not due to his negligence.

[42] Yet, we do have the benefit of both defendants' expertise when they told the jury that had the treatment been given as prescribed, Winifred would not have been harmed. The jury could infer from this testimony that plaintiff's mishap would not have occurred if due precautions had been taken.

[43, 44] On the state of the record, res ipsa was applicable. In this state the application of res ipsa establishes prima facie evidence of negligence. Cinq-Mars v. Kelley, *supra*; Motte v. First National Stores, Inc., 76 R.I. 349, 70 A.2d 822 (1950). Prima facie evidence is no different from any other evidence of probative force. It must be submitted to the trier of facts to be weighed by it together with all other probative evidence in the case. State v. Lutye, R.I., 287 A.2d 634 (1972).

[45] Before leaving res ipsa, we deem it appropriate to point out that at times the third element of the res ipsa doctrine has been set forth not in terms of plaintiff's freedom from contributory negligence, but rather in terms of a requirement that the plaintiff aver that he did not know what caused his injuries. This requirement first appeared in Dufresne v. Theroux, 69 R.I. 280, 32 A.2d 609 (1943), and was repeated again in Motte v. First National Stores, Inc., *supra*, and Lopes v. Narragansett Electric Co., 102 R.I. 128, 229 A.2d 55 (1967). The rationale for this requirement is found in *Dufresne* where the court commented adversely on the apparent inconsistency of plaintiff's pleading. *Dufresne*, *Motte* and *Lopes* were tried at a time when common law pleading was in full flower in this jurisdiction. In the *Cinq-Mars* case, we permitted the use of res ipsa even though the declaration contained counts alleging specific acts of negligence. Whatever may have gone on before, plaintiff's case was tried at a time when the Superior Court's new Rules of Civil Procedure were in effect. Rule 8(e)(2) permits a plaintiff to state as many theories of recovery as the circumstances of his case will permit and he may allege inconsistent claims and not be required to make an election. 1 Kent, R.I.Civ.Prac. § 8.8 at 89 (1969). The plaintiff who pleads specific acts of negligence will no longer be precluded from the benefit of res ipsa. Res Ipsa Loquitur-Pleading, 2 A.L.R.3d 1335 (1965).

[46] Finally, the trial justice's refusal based on the lateness of the motion is at odds with the mandate of Rule 15(a), that leave to amend is to be freely given "when justice so requires." There is no suggestion in the record that the defendants would have been prejudiced by the additional count which, based on the defendants' testimony, could have led to a conclusion that some negligent act for which they are responsible caused the plaintiff's predicament.

The plaintiffs' appeal, with the sole exception of their motion to add the battery count, is sustained.